UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| WILLIAM H. WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:16-CV-236-CHB |
| | ) | |
| v. | ) | |
| | ) | **ORDER DENYING IN PART AND** |
| BAPTIST HEALTHCARE SYSTEM, | ) | **GRANTING IN PART DEFENDANT'S** |
| INC., | ) | **MOTION FOR SUMMARY** |
| | ) | **JUDGMENT** |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on the Defendant's Motion for Summary Judgment [R. 76].  On February 9, 2018, Plaintiff filed his brief in response [R. 84] and on February 23, 2018, the Defendant filed its timely reply [R. 88].  Plaintiff then moved for the Court to either strike portions of the Defendant's Reply or grant Plaintiff leave to file a sur-reply [R. 90].  Senior Judge Charles R. Simpson granted the motion to allow Plaintiff to file a sur-reply addressing the issues of emotional distress injuries and punitive damages [R. 96; R. 97; R. 99; R. 108; R. 109; R. 111].  Additionally, Plaintiff moved for leave to file a supplemental response to Defendant's Motion for Summary Judgment on the grounds that Plaintiff was required to file his Response Brief to Defendant's Motion for Summary Judgment [R. 84] before several fact and expert witnesses had been deposed [R. 94].  After this motion was filed, Defendant sought leave to file a response to the Plaintiff's sur-reply [R. 102]  After briefing, United States Magistrate Judge Dave Whalin granted both motions [R. 107].  Finally, the unfortunate passing of Plaintiff's expert Dr. Nipomnick necessitated the deposition of a new expert, Dr. Glaser, and with it another round of supplemental briefing [R. 141; R. 142]. All the above briefing now stands fully

- 1 -

submitted to the Court.  For the following reasons, the Court will grant in part and deny in part the Defendant's Motion for Summary Judgment.

## I.    Background

While the parties contest many facts in this case, discussed in further detail below, the facts at the core of this dispute are uncontested.  On April 4, 2015, Plaintiff William Williams was working as a tow truck driver when he began to experience chest pain, causing him to go to the Paris-Bourbon County fire station where he was administered an EKG by James Grimes, an EMT. [R. 76-1, Defendant's Memorandum in Support of Motion for Summary Judgment ("Def.'s Memo in Support"), at p. 3, Page ID #: 517; R. 84, Plaintiff's Memorandum in Response, ("Pl.'s Response"), at p. 5, Page ID #: 1061]   Because the EKG readings did not show any dire concerns, Plaintiff left the fire station and continued about his business. *Id.*  Later that evening, Plaintiff experienced additional chest pains and returned to the same fire station seeking treatment. *Id.*  EMT Grimes placed Plaintiff in an ambulance where he was again administered an EKG, which this time indicated that Plaintiff was having a suspected ST-Elevation Myocardial Infraction ("STEMI"), known colloquially as a heart attack. *Id.* Plaintiff was taken in an ambulance to Defendant Central Baptist Hospital, now known as Baptist Health Lexington ("BHL"). *Id.*

When the ambulance was roughly ten minutes away from BHL, EMS personnel in the ambulance called BHL to inform them of Plaintiff's arrival and his suspected STEMI. [R. 76-1, Def.'s Memo in Support, at p. 3, Page ID #: 517; R. 84, Pl.'s Response, at p. 6, Page ID #: 1062] This call was received by Nurse Micki Blankenship who told the ambulance to come to BHL. [R. 76-1, Def.'s Memo in Support, at p. 4, Page ID #: 518; R. 84, Pl.'s Response, at p. 6, Page ID #: 1062]  Following this call, Nurse Blankenship informed her Charge Nurse Nicolas Newsome that

a STEMI patient was inbound. *Id.* However, Nurse Newsome reminded Nurse Blankenship that

BHL was not currently able to care for STEMI patients and that Plaintiff would need to be

diverted to another hospital. *Id.* Following this conversation Nurse Blankenship tried, but failed,

to contact the ambulance to inform them of BHL's inability to care for Plaintiff. *Id.* Shortly

thereafter the ambulance carrying the Plaintiff was met at the door of BHL by Nurse

Blankenship, who informed the EMS personnel that BHL would be unable to care for Plaintiff

and directed them to take him to the nearby University of Kentucky Medical Center ("UK

Medical Center"). [R. 76-1, Def.'s Memo in Support, at p. 5, Page ID #: 519; R. 84, Pl.'s

Response, at p. 7, Page ID #: 1063] While at UK Medical Center Plaintiff underwent a

successful five-vessel coronary bypass procedure. [R. 76-1, Def.'s Memo in Support, at p. 5,

Page ID #: 519; R. 84, Pl.'s Response, at p. 8, Page ID #: 1064]

Following this incident, the Centers for Medicare and Medicaid Services ("CMS")

investigated BHL. [R. 76-1, Def.'s Memo in Support, at p. 7, Page ID #: 521; R. 84, Pl.'s

Response, at p. 8, Page ID #: 1064] CMS required BHL to submit a plan of corrections, which

was to include a response to the events that form the basis of this lawsuit. *Id.* Following

submission of this plan and at the conclusion of its investigation, CMS withdrew its action to

terminate BHL's license with Medicare and Medicaid. *Id.*

Finally, on April 1, 2016 Plaintiff filed suit against BHL in Jefferson County Circuit

Court asserting claims for medical negligence, negligence per se, and violation of 42 U.S.C.

§ 1395DD, otherwise known as the Emergency Medical Treatment and Active Labor Act

("EMTALA") [R. 1-1, Compl., ¶¶ 14-28]. In his Complaint, Plaintiff states that Defendant's

actions resulted in, but were not limited to, (a) additional damage to his heart and vascular

system, including increased dead heart muscle; (b) prolonged pain and suffering as he continued

to endure a myocardial infarction without treatment; (c) severe emotional suffering and mental anguish at the prospect of not receiving medical care while enduring a life-threatening emergency medical condition; and (d) additional medical expenses by being transported and provided longer care by EMS. *Id*. at ¶13.  Plaintiff's Complaint stated demands for both compensatory and punitive damages. *Id.* at p. 8.  On April 22, 2016 Defendant removed this case to the Western District of Kentucky. [R. 1, Notice of Removal]

## II.    Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  When determining a motion for summary judgment, a court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Lindsay v. Yates,* 578 F.3d 407, 414 (6th Cir. 2009).  The court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 265 (1986).  When, as here, the defendant moves for summary judgment, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*. at 252.  The initial burden of establishing no genuine dispute of material fact rests with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The Court "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).  If the moving party satisfies this burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Id*. at 324.  Where "a party fails to properly

support an assertion of fact or fails to properly address another party's assertion of fact," the Court may treat that fact as undisputed. Fed. R. Civ. P. 56(e).

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 477 U.S. at 248. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.

### III.    Analysis

#### A.  Plaintiff is not barred from bringing suit for damages resulting from an EMTALA violation.

Defendant's statement that Plaintiff cannot recover civil penalties for an EMTALA violation bears brief mention at the outset of this opinion. Defendant argues that an individual plaintiff may not recover civil penalties for an EMTALA violation, however Defendant concedes that an individual plaintiff may file a civil action to recover damages for personal injury. [R. 76-1, Def.'s Memo in Support, at p. 18, Page ID #: 532]  It is unclear exactly why Defendant raises this argument as Plaintiff's Complaint clearly brings damages for personal injury, which Defendant concedes is perfectly proper. [R. 1-1, Compl., ¶13]  To the extent that Defendant's argument is one against punitive damages, as Plaintiff suggests, it is dealt with more fully below. Therefore any further discussion by this Court regarding civil penalties, which Plaintiff has not moved for, would be immature at this juncture.

**B. Plaintiff did not suffer any "additional heart damage" from the delayed diversion or the EMTALA violation.**

Defendant first argues that Plaintiff cannot show that the delay he faced caused any "additional heart damage" as alleged by Plaintiff's Complaint and that he is therefore foreclosed from recovering under any theory of liability for this alleged harm [R. 1-1, Compl., ¶13]. At most, argues Defendant, Plaintiff can only produce evidence that there was a possibility of harm that itself cannot be quantified. [R. 76-1, Def.'s Memo in Support, at p. 11, Page ID #: 525] While Defendant argues that Plaintiff's inability to show causation makes summary judgment appropriate as to all of Plaintiff's claims, including negligence per se, medical negligence, and violations of EMTALA, Defendant does not specifically address the legal standard applicable to each of Plaintiff's claims for liability. Therefore, it is instructive to first address the issue of causation in the context of negligence per se, medical negligence, and EMTALA violations.

In order to recover on a theory of negligence per se Plaintiff must show that the Defendant's breach of a duty caused his damages. *Lewis v. B & R Corp.*, 56 S.W.3d 432, 438 (Ky. App. 2001) ("While it is unquestioned that violations of statutes constitute negligence per se, that statement is coextensive with the requirement that the violation 'must be a substantial factor in causing the result.'") (citing *Britton v. Wooten*, 817 S.W.2d 443, 447 (Ky. 1991)).

As to medical negligence, under Kentucky law, medical expert testimony is generally required to establish causation. *Baylis v. Lourdes Hosp., Inc.*, 805 S.W.2d 122, 124 (Ky. 1991) ("It is an accepted principle that in most medical negligence cases, proof of causation requires the testimony of an expert witness because the nature of the inquiry is such that jurors are not competent to draw their own conclusions from the evidence without the aid of such expert testimony." (footnote omitted)). The expert's opinion must be based "on reasonable medical probability and not speculation or possibility." *Sakler v. Anesthesiology Assocs. P.S.C.*, 50

S.W.3d 210, 213 (Ky. App. 2001).  When assessing the expert testimony, however, "substance should prevail over form and . . . the total meaning, rather than a word-by-word construction, should be the focus of the inquiry." *Baylis*, 805 S.W.2d at 124.  There are two exceptions to this rule: "a situation in which 'any layman is competent to pass judgment and conclude from common experience that such things do not happen if there has been proper skill and care" and when medical experts "provide a sufficient foundation for *res ipsa loquitur* on more complex matters." *Andrew v. Begley*, 203 S.W.3d 165, 170 (Ky. App. 2006) (citing *Perkins v. Hausladen*, 828 S.W.2d 652, 655 (Ky. App. 1992)).

Finally, in order to recover on an EMTALA claim it is "the plaintiff's burden to establish that it was the EMTALA violation, not the underlying medical emergency, that caused the alleged harm." *Scott v. Mem'l Health Care Sys., Inc.*, 660 F. App'x 366, 372 (6th Cir. 2016). While the Sixth Circuit has indicated that such causation may be proven without expert medical testimony, it has indicated that the facts establishing causation in such a case must be sufficiently egregious to allow jurors or other finders of fact to rely on their common knowledge. *Id.* at 374.

Therefore, under any theory of liability, Plaintiff's ability to recover for additional damage to his heart turns on whether he can show BHL's actions caused his injury.

Defendant supports its argument with citation to three expert witnesses: (1) Plaintiff's first retained expert, Dr. Elliot Nipomnick, (2) Dr. Paula Hollingsworth, who was BHL's interventional cardiologist on call on April 4, 2015, and (3) Dr. David Glaser, who served as Plaintiff's substitute expert after Dr. Nipomnick's passing.  When asked about the extent of Plaintiff's injuries due to the delay caused by his diversion to UK Medical Center, Dr. Nipomnick states, "I think there was probably some additional damage, but it's nothing that I can quantitate at all." [R. 76-15, Nipomnick Dep., at p. 19, 66:18-20]  Dr. Nipomnick goes on to

state that while "there was probably ongoing ischemia and injury" that he "couldn't quantitate and [he] couldn't tell . . . the degree that occurred." *Id*. at p. 19, 67:9-12.  Defendant next cites to Dr. Hollingsworth's affidavit in which she claims that Plaintiff received faster medical treatment by being transferred to UK Medical Center than if he had stayed at BHL. [R. 76-16, Hollingsworth Aff., at ¶4]  Therefore, Dr. Hollingsworth concludes that Plaintiff "did not suffer any injury as a result of the transfer from BHL to UK Chandler Medical Center over a short period of several minutes.  In fact, due to the time of day, his evaluation and treatment occurred sooner than it would have if he had stayed at BHL." [R. 76-16, Hollingsworth Aff., at ¶¶4-5] Defendant further points out that Dr. Glaser agreed with Dr. Hollingsworth's opinion that Plaintiff did not suffer any cardiac injury as a result of the delay when Dr. Glaser said that "there was certainly no measurable injury that we could point to in that situation." [R. 141-1, Glaser Dep., at 55:21–56:22].  Defendant therefore concludes that the material facts can only show, at most, that there was some possibility of an injury due to the diversion and that this is insufficient as a matter of law to create liability. [R. 76-1, Def.'s Memo in Support, at p. 11, Page ID #: 525]

Finally, in its Response to Plaintiff's Supplemental Response, Defendant argues that Plaintiff mischaracterizes Dr. Jeffery Breall's testimony by ignoring his assertion that Plaintiff's heart attack spontaneously aborted without treatment minutes after his arrival at UK Medical Center. [R. 111, Defendant's Supplemental Response ("Def.'s Supp. Response"), at p. 2, Page ID #: 1868]  Dr. Breall concludes that because Plaintiff's heart attack would have spontaneously aborted at the same time at BHL as it did at UK Medical Center, the transfer to UK Medical Center ultimately had no effect on the damage suffered by Plaintiff. *Id*.

Plaintiff responds by arguing that the delay Plaintiff experienced was actually over twenty minutes and not the six to seven minutes which Defendant claims. [R. 84, Pl.'s Response,

at p. 16, Page ID #: 1072]  Plaintiff argues that the delay attributable to the Defendant is not just the time spent transferring Plaintiff from BHL to UK Medical Center, but the total time lost after Nurse Blankenship mistakenly told the ambulance to bring Plaintiff to BHL. *Id.*  If Nurse Blankenship had correctly informed the ambulance in the first call that they needed to go to UK Medical Center and not BHL, Plaintiff argues that he would have been seen by medical staff nearly twenty minutes earlier than eventually occurred. *Id.*  This was due not only to the wasted time driving to BHL, but also to the fact that the ambulance was unable to alert UK Medical Center to assemble its cath. team to care for Plaintiff until after BHL had already denied him, as opposed to if Nurse Blankenship had told the ambulance in the first call that BHL would be unable to care for Plaintiff and for them to take him directly to UK Medical Center. [R. 108, Plaintiff's Supplemental Response, ("Pl.'s Supp. Response"), at p. 6, Page ID #: 1727]  Plaintiff couples this dispute as to the duration of the delay with expert testimony he alleges shows that damages must have occurred.  Plaintiff cites Defendant's expert Dr. Jeffrey Breall as stating that Mr. Williams suffered a "trivial amount of heart damage." [R. 108-1, Breall Dep., at p. 15, 55:13]  While not specifically stated in such terms, the implication of Plaintiff's argument is that if the Plaintiff suffered some physical injury in the six to seven minutes as admitted by the Defendant, then there must assuredly have been at least this much, if not more, physical damage if his transfer in fact caused a greater delay.

Under any theory of liability, Plaintiff must show damages, which he simply has not done.  Plaintiff has shown that there is a material factual dispute as to whether he would have received faster treatment if Nurse Blankenship had correctly routed him to UK Medical Center when his STEMI was first called in to BHL.  Defendant's argument that, after he was mistakenly brought to BHL, he received faster treatment at UK Medical Center than if he had stayed at BHL

misses the point.  Plaintiff should never have been brought to BHL in the first place, and it is this initial lost time that Plaintiff also asserts caused him damage.  However, while Plaintiff can potentially show that Defendant's actions led to him getting slower treatment, he still cannot tie it to any physical damages.  Doctors Breall, Hollingsworth, and Glaser state strongly that no measurable damage occurred during the transfer.  While the experts certainly make reference in deposition testimony to trivial or hypothetical injury, a fair reading of their depositions indicates that they believe that Plaintiff suffered no measurable physical injury.  Plaintiff's argument that he simply must have suffered some physical injury because he faced slower treatment due to BHL's mistakes cannot survive summary judgment in the face of the Defendant's evidence.

### C.  There is no evidence to support Plaintiff's claims for (1) past or future medical treatment or expenses, however there is evidence to support (2) prolonged pain and suffering, and (3) anxiety or mental health injuries

Defendant next argues that Plaintiff cannot recover on his claims for past or future medical treatment or expenses, prolonged pain and suffering, and mental anxiety or mental health injuries.  Each claim is discussed in further detail below.  For the following reasons, the Court will grant the Defendant summary judgment as to the Plaintiff's claims for medical expenses, and will deny its claims for summary judgment as to emotional distress and pain and suffering.

### i.    Medical Expenses Caused by Transfer

Defendant first argues in its motion for summary judgment that there is simply no evidence to support any claims for past or future medical treatment or expenses. [R. 76-1, Def.'s Memo in Support, at p. 17, Page ID #: 531]  The Court agrees that Plaintiff has not provided any argument nor pointed to any evidence to support his claim for additional medical expenses as a result of his transfer from BHL to UK Medical Center.  The factual record developed by the

briefs does not show that Plaintiff was charged any additional amount for the re-direction. Further, Plaintiff ultimately received a surgery that would have been required in either hospital. Because the record does not indicate that Plaintiff was forced to incur any additional medical expenses, as he would be required to show at trial, summary judgment is therefore appropriate as to this claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating that the burden placed upon the movant for summary judgment is to show that the non-moving party has failed to establish an essential element of his case upon which he would bear the ultimate burden of proof at trial); *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404 (6th Cir. 1992) ("[T]here is no duty imposed upon the trial court to 'search the entire record to establish that it is bereft of a genuine issue of material fact.'") (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1480 (6th Cir. 1989)).

### ii.    Prolonged Pain and Suffering

Defendant first argues that Plaintiff's claims for prolonged pain and suffering must fail because Plaintiff received faster care at UK Medical Center than he did at BHL. [R. 76-1, Def.'s Memo in Support, at p. 17, Page ID #: 531]  As with Plaintiff's claims for physical injury, discussed above, Defendant also states that because Plaintiff's heart attack spontaneously subsided without medical intervention, the Plaintiff would have stopped feeling the pain of his heart attack regardless of the actions taken by Nurse Blankenship. [R. 88, at p. 2, n. 4, Page ID #: 1510]  Additionally, Defendant argues that because Plaintiff cannot produce expert testimony to show that he suffered prolonged pain and suffering, his claim fails to satisfy the standards set by Kentucky law. [R. 111, Def.'s Supplemental Response, at pp. 3-4, Page ID #: 1869-70]

In response[1] Plaintiff cites several facts as indicating that Plaintiff was experiencing both anxiety and pain and suffering: Plaintiff's heart rate increased from 86 beats per minute to 111 beats per minute upon being rejected from BHL, testimony of EMTs Grimes and Blankenship indicated that Plaintiff was cursing and upset upon being rejected from BHL, the Plaintiff's own testimony that he was frightened, angry, and concerned he might die when he was rejected from BHL, the testimony of Plaintiff's expert Dr. Nipomnick who stated that he imagined that Plaintiff felt anxiety upon his rejection from BHL [R. 84, Pl.'s Response, at p. 15, Page ID #: 1071], and the testimony of Plaintiff's substitute expert, Dr. Glaser, who stated that Plaintiff "testified that he thought he was going to die, so that would worry most people" [R. 142-2, Glaser Dep., at 65:8-20]. Plaintiff goes on to argue that the deposition testimony of Dr. Breall and Dr. Hollingsworth show a factual dispute as to whether Plaintiff was suffering any pain. [R. 108, Pl.'s Supp. Response, pp. 2-4, Page ID #: 1723-25]

As discussed above, however, there is a factual dispute as to whether Plaintiff would have been seen faster had he been brought straight to UK Medical Center. Therefore, Plaintiff could show that he did indeed get slower treatment by being re-routed to UK Medical Center from BHL. If he was continuing to feel the pain of the heart attack at that time, there is clearly a genuine dispute as to the material fact of whether the diversion caused him to feel extra pain and suffering during the time lost mistakenly going to BHL in the first place. Defendant argues that Plaintiff actually got faster treatment at UK Medical Center than he would have at BHL. Again, this misses the mark. The real question is whether the Plaintiff would have gotten quicker care at UK Medical Center if he had been sent there in the first place, and never been mistakenly brought to BHL.

---

[1] The response includes a sur-reply, which was filed with leave of the Court given the new arguments raised by the Defendant in its reply brief. [R. 96]

Defendant's stronger argument is that Plaintiff must show that he was experiencing pain through expert testimony. However, not only does Plaintiff have two experts—Dr. Nipomnick and Dr. Glaser—testifying about his prolonged pain and suffering, but there is also an exception to the requirement of expert testimony, as explained above, where the layperson could understand the factual issue without the aid of a medical expert. The proposition that "an individual goes through pain while having a heart attack" must satisfy this test. Further, the testimony of the EMTs who cared for Plaintiff provide further support, appropriate for a layperson, to find that the Plaintiff was experiencing pain and suffering. Therefore, unlike with respect to physical injury where Plaintiff simply has not marshalled any evidence of damages, Plaintiff can show enough evidence to link the delay in arrival to UK Medical Center with a tangible injury, namely his pain and suffering. *Coleman v. Simpson*, 471 S.W.2d 702, 704 (Ky. App. 1971) ("The medical evidence supported a finding that the particular condition usually caused pain, and the plaintiff's own testimony of the extent and duration of his pain was within the province of the jury to weigh and evaluate.").

### iii.    Severe emotional suffering and mental anguish

In its initial Motion for Summary Judgment, Defendant argues that Plaintiff has only presented meager evidence that he suffered emotional damage, and as such this cannot speak to his mental health condition at the time of the diversion to UK Medical Center. [R. 76-1, Def.'s Memo in Support, at p. 18, Page ID #: 532] Defendant argues that, in line with cases such as *Sakler* discussed above, at most Plaintiff can show that his claims for pain and suffering or anxiety and mental health injuries were the possible, not probable, result of his diversion from BHL. Further, Defendant argues that Plaintiff cannot show that any of his evidence, such as a fluctuating heart rate or EKG readings, were caused by his diversion from BHL as opposed to just being the result of his heart attack. In its reply brief, Defendant advances two additional

arguments that Plaintiff cannot recover damages for emotional suffering and mental anguish: that such claims require expert testimony and that such claims require the Plaintiff to establish that there was a significant effect on his everyday life or that he faced significant treatment. The Court will address the legal standard first.

To rebut Defendant's argument that he is required to present expert testimony, Plaintiff cites to *Indiana Ins. Co. v. Demetre*, 527 S.W.3d 12 (Ky. 2017). [R. 99, p. 1, Pl.'s Sur-Reply, Page ID #: 99] In *Demetre*, the Kentucky Supreme Court addressed the extent to which its evidentiary standard for claims of negligent and intentional infliction of emotional distress, stated in *Osborne v. Keeney*, 399 S.W.3d 1 (Ky. 2012), is applicable to all cases in which a Plaintiff seeks emotional damages as part of his prayer for relief. In limiting *Osborne*, the Court held that the "requirement of expert medical or scientific proof is limited to claims of intentional or negligent infliction of emotional distress." *Demetre*, 527 S.W.3d at 39. The Court based its reasoning on the fact that "[w]hile the nature of 'stand-alone' emotional injuries creates a risk of fraudulent claims, that risk is reduced 'however, in a case in which a claim for emotional injury damages is one of multiple claims for damages.'" *Id*. (citing *Estate of Amos v. Vanderbilt Univ.*, 62 S.W.3d 133, 137 (Tenn. 2001)).

Despite Defendant's argument to the contrary, this case does not involve stand-alone emotional injury damages. Rather, Plaintiff's complaint clearly alleges claims for negligence per se for violation of various Kentucky statutes, medical negligence, and violation of EMTALA. [R. 1-1, Compl., ¶¶ 14-28] Further, Plaintiff alleges that these violations caused not only mental and emotional anguish, but also physical damage, prolonged pain and suffering, and medical expenses.

This finding also applies to the Defendant's argument that the Plaintiff must show that the emotional injury is "severe or serious." The *Osborne* court stated that an emotional injury is sufficiently severe or serious only if it "significantly affects the plaintiff's everyday life or require[s] significant treatment." *Osborne*, 399 S.W.3d at 17. Defendant's reliance on *Osborne* is again misplaced, as the Kentucky Supreme Court has explicitly held that the heightened evidentiary standard from *Osborne* applies only to stand-alone claims for intentional or negligent infliction of emotional distress. *Demetre*, 527 S.W.3d at 39. Rather, the Court will apply the standard established by the Kentucky Supreme Court in *Motorists Mut. Ins. Co. v. Glass*, 996 S.W.2d 437, 454 (Ky. 1997), cited approvingly in *Demetre*, that requires a plaintiff's proof to "be clear and satisfactory . . . . [E]vidence based on conjecture will not support a recovery for such damages." The jury must be able to "infer that anxiety or mental anguish in fact occurred." *Id*. Therefore, the Court does not find that either expert testimony or any effect on the Plaintiff's everyday life is required as a matter of law for Plaintiff to show emotional damages in this case.

The Court is therefore left to decide whether Plaintiff has marshaled enough evidence to possibly show at trial that he has suffered emotional injuries to a "clear and satisfactory" degree. First, even though the Court does not find that expert testimony is required, Dr. Glaser did call attention to the emotional distress aspect of Mr. Williams's injury, agreeing that "perhaps there was an anxiety component that existed . . . during the transfer." [R. 142-2, Glaser Dep., at 78:24–79:5] Second, a plaintiff's testimony can stand alone to prove emotional damages, so long as the testimony consists of more than conclusory statements and explains the circumstances of the injury in reasonable detail. *O'Connell v. Pursuit, LLC,* Civil No. 3:17-CV-067-GFVT, 2019 WL 456223, *4 (E.D. Ky. Feb. 5, 2019) (citing *Bach v. First Union Nat'l Bank*, 149 F. App'x 354, 361–62 (6th Cir. 2005)). Plaintiff's deposition testimony lays out with reasonable detail the

emotional trauma he faced when he was denied entry to BHL while undergoing a serious medical emergency.  For example, Plaintiff alleges proclaiming when he was denied treatment that "I guess you son of bitches are going to let me die." [R. 84-20, Williams Dep., at p. 31, 122:23-24]  Further, Plaintiff's own testimony is bolstered by that of the EMT technicians who cared for him during the events in question and who testified as to his cursing and exasperation upon rejection from BHL. [R. 84-11, Grimes Dep., at p. 11, 44:22-23]  While Defendant may question the strength of this evidence, that question is not appropriate at the summary judgment stage.

### D.  Plaintiff cannot recover Punitive Damages

Defendant next argues that Plaintiff cannot recover punitive damages.  Defendant advances several theories as to why Plaintiff cannot recover punitive damages, namely: that because Plaintiff cannot show any compensatory damages he cannot recover punitive damages, that Plaintiff cannot show the clear and convincing evidence necessary under Kentucky law to show punitive damages, and that because BHL did not ratify Nurse Blankenship's actions punitive damages are foreclosed by KRS § 411.184(3).  The Court will address each argument in turn below.

First, Kentucky law provides that a plaintiff may recover punitive damages in the absence of compensatory damages as long as his claims are such that compensatory damages might be awarded. *Commonwealth Dep't of Agric. v. Vinson*, 30 S.W.3d 162, 166 (Ky. 2000) ("Where the plaintiff has suffered an injury for which compensatory damages, though nominal in amount[,] may be awarded, the jury may in a proper case[] award punitive damages as well.").

Next, Kentucky law provides two bases for recovery of punitive damages: KRS § 411.184 and the common law.  Under KRS § 411.184, a Plaintiff may recover punitive

damages "only upon proving, by clear and convincing evidence, that the defendant from whom such damages are sought acted toward the plaintiff with oppression, fraud or malice." KRS § 411.184(2). In *Williams v. Wilson*, 972 S.W.2d 260 (Ky. 1998) the Kentucky Supreme Court held that the language defining malice was unconstitutional before going on to state that punitive damages may nevertheless be awarded under the common law standard of "gross negligence." Gross negligence is defined as "wanton or reckless disregard for the lives, safety, or property of others." *Gibson v. Fuel Transport, Inc.*, 410 S.W.3d 56, 59 (Ky. 2013). Therefore, "punitive damages may be awarded, when the evidence satisfies either the statutory standard of KRS 411.184(2), or the common law standard of gross negligence." *Saint Joseph Healthcare, Inc. v. Thomas*, 487 S.W.3d 864, 870 (Ky. 2016). Plaintiff argues, in line with this decision, that BHL acted with gross negligence. [R. 84, Pl.'s Response, at p. 16, Page ID #: 1072]

Defendant further argues that Plaintiff cannot recover punitive damages because he cannot make the required showing under KRS § 411.184(3), which "expressly prohibits the assessment of punitive damages against an employer for the conduct of an employee or agent, unless the offensive conduct was 1) authorized by the employer; 2) anticipated by the employer; or 3) ratified by the employer." *Saint Joseph*, 487 S.W.3d at 873. Defendant is correct that to the extent Plaintiff is basing his claims for punitive damages on the actions of Nurse Blankenship, he must conform with the standards established by KRS § 411.184(3). Plaintiff seemingly attempts to sidestep the requirements of KRS § 411.184(3) by stating that his claims are not brought pursuant to a theory of respondeat superior but rather against the hospital itself. Yet Plaintiff also claims that BHL is liable because the conduct in question was "authorized by the employer" as well as because Nurse Blankenship's conduct could have been anticipated by BHL (the very language of § 411.184(3)). [R. 108, Pl.'s Supp. Response, at p. 14, Page ID #: 1735] It is unclear

the extent to which an employer may be held liable for punitive damages for its policies or procedures outside of the framework of KRS § 411.184(3) in a situation such as this where the bulk of the allegedly negligent behavior is made by various actors working under a company's policy and procedures. *MV Transp., Inc. v. Allgeier,* 433 S.W.3d 324, 338 (Ky. 2014) ("[A] finding of gross negligence and an award of punitive damages may be based, at least in part, upon evidence regarding the policies and procedures of the company.") (citing *Horton v. Union Light, Heat & Power Co.*, 690 S.W.2d 382, 388 (Ky. 1985)).  In an abundance of caution, the Court will analyze Plaintiff's claims for punitive damages brought pursuant to the actions of employees under the framework provided by KRS § 411.184(3) as well as the common law standard of gross negligence applicable to the hospital itself.

Before analyzing Plaintiff's argument for punitive damages, it is instructive to explore two cases, cited above, in which the Kentucky Supreme Court has found punitive damages to be appropriate.  In *Saint Joseph*, the deceased's estate sued a hospital and various emergency room medical personnel following his discharge and later death.  The deceased—a diseased, paraplegic, uninsured indigent—attempted to seek treatment at the defendant hospital twice within approximately sixteen hours and each time presented abdominal pain, nausea, vomiting, and severe constipation. *Saint Joseph*, 487 S.W.3d at 868–69. After his final discharge, the decedent was told that if he returned to the hospital again he would be arrested. *Id.*  While family members urged the decedent to return to the hospital, he declined, citing his fear of arrest, and died shortly thereafter. *Id.* at 869.  In assessing punitive damages against the hospital, the Supreme Court of Kentucky stated:

> The resulting harm was not economic; it was physical in the most egregious sense, with Gray being *twice* ushered away from the Hospital in great physical pain and mental anguish, and dying at his niece's home under desperate circumstances. In rather dramatic fashion and in violation of federal law, the offensive conduct

> exhibited a gross indifference to, and a reckless disregard for, Gray's health and safety. Gray was a paraplegic pauper, unquestionably among the most financially vulnerable members of the community. The harm that befell Gray was not accidental; he was intentionally and somewhat forcefully evicted from the Hospital while he suffered in severe pain from an illness that turned fatal. The threat to have him arrested manifested a measure of ill-will commensurate with malice.

*Id.* at 868–69.  The court concluded that the egregious disregard for the decedent's health and well-being clearly justified the imposition of punitive damages. *Id.* at 873.

In *Allgeier*, a wheelchair bound plaintiff sued the company responsible for her paratransit bus service following a fall during the operation of the bus's wheelchair lift.  Due to a misalignment in the wheelchair lift and the bus operator's negligence, the plaintiff fell from her chair onto the lift "with such force that the femur of each of her legs splintered, causing extraordinary pain." *Allgeier*, 433 S.W.3d at 328.  Rather than immediately care for the plaintiff's injuries, the defendant's employees spent their time taking photographs of the scene and sequestering the driver in an attempt to follow the company's policy of guarding against "fraudulent and excessive liability claims" by promptly photographing accident scenes. *Id.* at 328–29.  After roughly twenty minutes, emergency medical services were finally called, and even then the company's personnel only told them that the plaintiff was experiencing "back pain." *Id.* at 328.  All the while, plaintiff "was lying in intense pain on the metal lift in sub-freezing weather covered only with a thin blanket" that a nearby resident had brought to her. *Id.*  Finding summary judgment dismissing the plaintiff's punitive damages claim to be inappropriate, the Supreme Court of Kentucky stated that the defendant "placed its own financial self-interests ahead of Allgeier's urgent need for medical assistance, and callously left Allgeier suffering helplessly in dire pain and distress in subfreezing weather." *Id.* at 338.

Plaintiff points to various facts in order to establish that punitive damages are appropriate in this case.  Specifically:

- BHL failed to obtain on-call CT Surgeon coverage from April 3-5, 2015.
- BHL decided to transfer patients needing CT surgery to UK Medical Center with minimal written instructions to staff and no written agreement with UK Medical Center.
- BHL failed to communicate the April 3, 2015 decision to go on diversion.
- BHL failed to provide any assistance to Nurse Blankenship or prepare for Plaintiff's arrival once it was known he was inbound to the hospital.
- Denying Plaintiff a medical screening exam and stabilization.
- Assuming Plaintiff would find the care he needed without taking any positive steps to ensure he would.

[R. 84, Pl.'s Response, at pp. 18-21, Page ID #: 1074–77]. Plaintiff states that these events show that BHL recklessly endangered both Plaintiff's life as well as the greater public safety, qualifying him for punitive damages. However, when viewed in light of decisions like *Saint Joseph* and *Allgeier*, it is clear that Defendant's actions do not rise to the level mandating punitive damages.

First, Plaintiff points to the decision not to have CT surgeons on call, therefore requiring a diversion policy, as reckless, citing the OIG report that declining to have such coverage was a breach of 42 CFR § 489.20(r)(2)'s basic commitments for hospitals. [R. 84-2, OIG Report, at p. 3] Yet even assuming that this decision did indeed fall below the hospital's required standard of care, Plaintiff's own expert, Dr. Nipomnick, stated that it would not be unreasonable under the circumstances to address this problem with a diversion. [R. 76-15, Nipomnick Dep., at p. 20, 70:24-71:4] Furthermore, BHL's alleged misconduct of breaching the "basic commitments" for hospitals does not rise to the level of recklessness as in cases—such as *Saint Joseph* and *Allgeier*—where punitive damages were available. The Court in *Southard v. Belanger* conducted a similar comparative analysis at the summary judgment stage in determining that punitive damages were not available to the Plaintiff. In that case, the defendant tractor-trailer driver was talking on a hands-free mobile device, despite his employer's policy against cell phone use, at

the time of an accident. *Southard v. Belanger*, 966 F.Supp.2d 727, 739 (W.D. Ky. 2013).

Besides this alleged misconduct, however, the defendant was driving "within the speed limit,

apparently in the proper lane, without any suggestion of intoxication, and without a prior history

of automobile accidents." *Id.* at 740. The Court found that using a mobile device—even though it

breached company policy—did not constitute gross negligence because it did not "match the

level of culpability in the cases where punitive damages were available," such as where a driver

was intoxicated, or where there were several egregious instances of misconduct. *Id.* (internal

citations omitted).  Here, BHL contacted a *locum tenens* agency, attempted to obtain CT surgeon

coverage, and ultimately decided to divert patients in transfer for emergent cardiac

catheterization in an effort to promote patient safety. [R. 88, at p. 12, Page ID #: 1520]  The facts

here simply do not carry the "substantial" weight needed to reach the level of "clear and

convincing evidence" of gross negligence. *Southard*, 966 F.Supp.2d at 738.

      Plaintiff next claims that the lack of a written diversion policy created confusion and

showed additional recklessness, but Plaintiff's citation to the record shows at most mere

negligence.  In testifying about the use of a written policy, Charge Nurse Newsome stated that "I

suppose if they had, you know, had [the diversion decision] hanging around perhaps" it would

have helped, before stating that "perhaps if more eyes were on [the diversion decision]" the

diversion plan would have been better understood. [R. 84-8, Newsome Dep. at p. 13, 14:1-25]  In

addition, even though BHL did not physically post the diversion decision, BHL did send a

memorandum to Emergency Department leadership and others throughout the hospital

explaining that there would be no in-house CT surgery coverage, and that any emergent cardiac

surgery was to be covered collaboratively with UK Medical Center. [R. 76-3, Mobley Dep., at

25:15-21, Page ID #: 572]  While BHL's diversion plan may not have been the perfect model of

efficiency or planning, it does not rise to the level of clear and convincing evidence of egregious recklessness and disregard for patient safety required for the imposition of punitive damages.

The Court next turns to Plaintiff's claims that BHL can be held liable for the actions of Nurse Blankenship. Under Kentucky law, it is "very difficult to obtain punitive damages against an employer for the negligent acts of its employees." *Jones v. Blankenship*, Civil No. 6:06-CV-109-KKC, 2007 WL 3400115, *4 (E.D. Ky. Nov. 13, 2007); *see also McGonigle v. Whitehawk*, 481 F.Supp.2d 835, 842 (W.D. Ky. 2007) ("Very few cases on record have recognized vicarious liability for punitive damages."); *Berrier v. Bizer*, 57 S.W.3d 271, 283 (Ky. 2001) ("Kentucky is the only state with a statute that so broadly limits vicarious liability for punitive damages."). In order to survive summary judgment, Plaintiff must present a genuine issue of material fact concerning whether Defendant authorized or anticipated the diversion decision. For the Defendant to have authorized the conduct in question, there must be pre-approval. *Univ. Med. Ctr., Inc. v. Beglin*, 375 S.W.3d 783, 793 (Ky. 2011). As to anticipation, generally courts have declined to find that an employer anticipated the conduct in question absent some pattern of conduct similar to the alleged gross negligence. *See Blankenship*, 2007 WL 3400115, at *4 (finding that an employee's two prior collisions did not exhibit a pattern of conduct such that the employer should have anticipated the gross negligence resulting in the collision at issue). An employer is generally considered not to be able to anticipate conduct that consists of a "gross deviation from well-established duties and policies" put in place to prevent the particular tortious act. *Beglin*, 375 S.W.3d at 794. However, "anticipation" does not require that the employer should have anticipated the exact undesirable manner in which the conduct occurred. *Patterson v. Tommy Blair, Inc.*, 265 S.W.3d 241, 244 (Ky. App. 2007).

Plaintiff first argues that because BHL's leadership "authorized" the decision to go on diversion for cardiac patients, which was itself a negligent decision, they are liable for punitive damages. [R. 108, Pl.'s Supp. Response, at p. 14, Page ID #: 1735]  However, while BHL undoubtedly authorized the diversion plan that was put into place, it specifically did not authorize Nurse Blankenship to divert the Plaintiff in the manner in which she did.  In fact, it is precisely because Nurse Blankenship did *not* act in the manner authorized by BHL that Plaintiff came to suffer the injuries in question. In *Blankenship*, for example, the Court found that the Defendant trucking company's authorization for "its driver . . . to drive" was not enough for purposes of KRS § 411.184(3). *Blankenship*, 2007 WL 3400115, at *3.  The Court reasoned that "[s]uch a conclusion would automatically impute liability to an employer in every action for punitive damages, a completely illogical result under state law that purports to strongly limit vicarious liability for punitive damages." *Id.* (citing *Berrier*, 57 S.W.3d at 283).  Similarly, here, BHL's general authorization of the diversion for cardiac patients is not the equivalent of pre-approval for the specific way Nurse Blankenship diverted the Plaintiff.

Any argument by Plaintiff that BHL could have anticipated Nurse Blankenship's actions is equally unavailing.  There is no indication in the record that Nurse Blankenship had any history of neglecting diversion orders or otherwise mishandling such aspects of patient care.  Rather, Nurse Blankenship's conduct was an act of simple negligence following a first-time situation where BHL was required to divert inbound STEMI patients to UK Medical Center. [R. 76-1, Def.'s Memo in Support, at p. 2, Page ID #: 516]  Similarly, in *Griffey v. Adams*, which involved a foot surgery that began on the wrong leg, there was neither allegation nor evidence that the doctor "engaged in any pattern of behavior such that [the hospital] should have reasonably expected him to make a surgical incision on the wrong foot." *Griffey v. Adams*, No.

- 23 -

5:16-CV-143-TBR, 2018 WL 3118186, at *5 (W.D. Ky. Jun. 25, 2018).  Accordingly, the Court

found that the hospital could not have reasonably anticipated such an event and granted summary

judgment to the hospital on the Plaintiff's punitive damages claim. *Id.* Ultimately, unlike in

*Allgeier*, Nurse Blankenship's actions as well as the policies and procedures which guided them,

were aimed at providing the best care possible for inbound STEMI patients.  Therefore, punitive

damages cannot be attributed to BHL in this situation for Nurse Blankenship's conduct.

### E.  Plaintiff's Contributory Negligence

Finally, Defendant claims that Plaintiff was negligent in not reporting to the hospital

earlier on April 4, 2015.  Therefore, BHL claims that it is entitled to receive judgment as to

Plaintiff's negligence and an apportionment jury instruction at trial.  However, because the

record indicates a genuine dispute as to whether the Plaintiff was negligent as well as to any

extra damage he may have caused to himself, the Court will decline to grant the Defendant

judgment on this claim.  Further, it is not even clear that Defendant would be entitled to a

contributory negligence instruction under Kentucky law for any negligence that occurred prior to

Defendant's actions. *Pauly v. Chang,* 498 S.W.3d 394, 418 (Ky. App. 2015) ("We agree with

those jurisdictions holding that a plaintiff's negligence that merely provides the occasion for the

medical care, attention, and treatment that subsequently results in a medical malpractice action

should not be considered by a jury assessing fault.  A medical malpractice case is distinctly

different from a personal injury case in which the injured party's pre-injury fault may be

considered in the apportionment of damages.").  Finally, to the extent that Defendant may

eventually be entitled to an apportionment jury instruction following trial, the Court finds that

this request is premature at the present time.

**F.  Conclusion**

For the foregoing reasons, the Court will grant in part and deny in part Defendant's Motion for Summary Judgment.  Having reviewed the relevant briefing, and the Court being otherwise sufficiently advised,

**IT IS HEREBY ORDERED** as follows:

1.    The Defendant's Motion for Summary Judgment [**R. 76**] is **GRANTED IN PART** and **DENIED IN PART**.

2.    Defendant's Motion for Summary Judgment [**R. 76**] is **GRANTED** as to the issue of physical damages.

3.    Defendant's Motion for Summary Judgment [**R. 76**] **GRANTED** as to the issue of past or future medical treatment or expenses.

4.    Defendant's Motion for Summary Judgment [**R. 76**] is **DENIED** as to the issue of damages of prolonged pain and suffering or severe emotional suffering and mental anguish.

5.    Defendant's Motion for Summary Judgment [**R. 76**] is **GRANTED** as to the issue of punitive damages.

6.    Defendant's Motion for Summary Judgment [**R. 76**] is **DENIED** as to the issue of Plaintiff's contributory negligence.

This the 30th day of September, 2019.

*Claria Horn Boom*

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY

cc:    Counsel of record