UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| WILLIAM H. WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:16-CV-236-CHB |
| | ) | |
| v. | ) | |
| | ) | |
| BAPTIST HEALTHCARE SYSTEM, INC., | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Several matters are presently before the Court. The first is Defendant Baptist Healthcare System, Inc.'s Objection [R. 293] to Plaintiff William Williams's Bill of Costs [R. 291]. The second is Baptist's Motion to Stay Execution of Judgment. [R. 294]. Plaintiff did not respond to Baptist's Objection to his Bill of Costs or to Baptist's Motion to Stay. The third is Baptist's Motion for Judgment Notwithstanding the Verdict pursuant to Rule 50(b), for a New Trial pursuant to Rule 59(a), or for Remittitur under Rule 59(e). [R. 296]. Plaintiff responded in opposition [R. 306], and Baptist replied [R. 312].[1] These matters are ripe for consideration.

### I. Background

On April 4, 2015, Plaintiff William Williams was working as a tow truck driver when he began to experience chest pain. [R. 300 (Trial Transcript, Testimony of Plaintiff William Williams), Vol. 3, p. 141]. He decided to go to the Paris-Bourbon County fire station, where he was administered an EKG. *Id.* at 145–47. Because the EKG readings did not show any dire

---

[1] Baptist simultaneously tendered a motion to exceed the fifteen-page limit for its reply. [R. 311]. Notably, Plaintiff's response [R. 306] exceeded Local Rule 7.1(d)'s twenty-five-page limit but he did not tender a similar motion for excess pages. The Court finds that, in fairness, it is appropriate to grant Baptist's motion [R. 311] and warns Plaintiff that failure to seek leave to exceed this District's page limitations could result in any excess pages being stricken in the future.

concerns, Plaintiff left the fire station and continued about his business. *Id*. Later that evening, Plaintiff experienced additional chest pains and returned to the same fire station seeking treatment. *Id*. An EMT placed Plaintiff in an ambulance, where he was again administered an EKG. *Id.* This time, the EKG indicated Plaintiff was having a suspected ST-Elevation Myocardial Infraction ("STEMI"), known colloquially as a heart attack. *Id*. Plaintiff was taken in an ambulance to Central Baptist Hospital, now known as Baptist Health Lexington. *Id*. at 150.

Unbeknownst to EMS personnel transporting Plaintiff, Baptist Health Lexington was under diversion of inbound transported heart attack patients because it had no on-call cardiothoracic surgeons between April 3, 2015 and April 5, 2015. [R. 170 (Joint Statement of the Case), p. 1]; *see also* [301 (Trial Transcript, Testimony of Dr. Stephen Toadvine), Vol. 4, pp. 152–57]. According to Baptist, its diversion plan did not include diverting heart attack patients who had actually arrived at the hospital, but the plan was miscommunicated to the ER staff who mistakenly believed they were diverting all heart attack patients. [R. 170 (Joint Statement of the Case), p. 1]. Indeed, Baptist acknowledged that the diversion decision was not communicated in a "consistent and uniform" manner in its official response to the Office of Inspector General (OIG). [Joint Exhibit 61 (OIG Report), p. 4].

When the ambulance transporting Plaintiff was roughly ten minutes away, EMS personnel in the ambulance called Baptist to inform it of Plaintiff's arrival and his suspected STEMI. [R. 299 (Trial Transcript, Testimony of Ashley McBride), Vo. 2, p. 135]. This call was received by Nurse Micki Blankenship, who testified that she believed Baptist was only on diversion the previous Friday night, and not Saturday,, and told the ambulance to proceed to Baptist. *Id.* at pp. 7–8.

Following this call, Nurse Blankenship informed her Charge Nurse, Nicolas Newsome, that a STEMI patient was inbound. *Id.* at 52. Nurse Newsome reminded Nurse Blankenship that

Baptist was unable to care for STEMI patients and that Plaintiff would need to be diverted to another hospital. *Id*. Nurse Blankenship then tried unsuccessfully to contact EMS personnel in the ambulance to inform them of Baptist's inability to care for Plaintiff. *Id*. at 16. Shortly thereafter, the ambulance carrying Plaintiff was met at the door of Baptist by Nurse Blankenship, who informed the EMS personnel that Baptist would be unable to care for Plaintiff and directed them to take him to a nearby hospital. Nurse Blankenship testified that she sent them to the University of Kentucky Medical Center. [R. 299 (Trial Transcript), Vol. 2, pp. 28–29]. However, EMS personnel testified that Nurse Blankenship directed them to Good Samaritan Hospital, and their records reflect this. [Joint Exhibit 1 (Paris-Boubon County EMS Records, p. 11]; [R. 298 (Trial Transcript), Vol. 1, p. 92]. Knowing that hospital did not have a catheterization lab, EMS personnel proceeded to University of Kentucky Medical Center. [Joint Exhibit 1 (Paris-Boubon County EMS Records, p. 11]. Once at UK Medical Center, Plaintiff underwent a successful five-vessel coronary bypass procedure. Although Plaintiff suffered no permanent damage to his heart, *see* [R. 248, p. 3]; [R. 298 (Trial Transcript), Vol. 1, p. 34], Plaintiff alleged his physical pain was increased and prolonged by the diversion and that he feared he would die when turned away by Baptist, worried he may not receive emergency treatment in time at UK Medical Center.

On April 1, 2016, Plaintiff sued Baptist in Jefferson County Circuit Court, asserting claims for medical negligence, negligence per se, and violation of 42 U.S.C. § 1395DD, otherwise known as the Emergency Medical Treatment and Active Labor Act ("EMTALA"). *See* [R. 1-1 ("Complaint"), ¶¶ 14–28]. Plaintiff sought compensatory and punitive damages. *Id.* at 8. On April 22, 2016, Baptist removed the case to this Court. *See* [R. 1 ("Notice of Removal")]. After a lengthy discovery period, on September 30, 2019, the Court granted summary judgment to Baptist on some of Plaintiff's claims, including Plaintiff's claim for punitive damages, leaving only claims for

common law medical negligence and EMTALA violations and the issue of damages for trial. [R. 143]. At a pretrial conference held October 25, 2021,[2] the Court reconsidered that decision and reinstated Plaintiff's claim for punitive damages. *See* [R. 204]; [R. 205]. On Baptist's motion [R. 226], the Court then continued generally the jury trial originally set for November 29, 2021. [R. 227].

The case ultimately proceeded to trial on September 6, 2022. At the close of proof, Baptist stipulated to liability on Plaintiffs' remaining claims and the jury was instructed as a matter of law that Baptist violated EMTALA and the standard of care a reasonably competent hospital staff had a duty to meet. [R. 248, p. 3]; [R. 287 (Jury Instructions), pp. 17, 18]. The jury was therefore left to consider the issue of gross negligence and what damages, if any, Plaintiff was entitled to for the emotional distress and pain and suffering caused by Baptist's EMTALA violations and medical negligence. The jury ultimately awarded Plaintiff compensatory damages in the amount of $545,000 and punitive damages in the amount of $1,850,000. The Court entered Judgment of $2,395,000 on September 13, 2022. [R. 290].

## II.   ANALYSIS

### A.  Plaintiff's Bill of Costs

Plaintiff filed his Bill of Costs with the Court on September 14, 2022. [R. 291]. Baptist timely objected to certain fees, including a $3,325 deposition fee for Baptist's expert witness Dr. John Hyde, a $2,000 deposition fee for Defendant's expert witness Dr. Jeffrey Breall, and a $499.55 fee for a transcript of the October 25, 2021 Pretrial Conference. [R. 293, p. 1]. Baptist asks the Court to set aside the deposition fees of Drs. Hyde and Breall because expert witness fees are not permitted to be taxed as costs under 28 U.S.C. § 1920, and to reduce the transcript fee for

---

[2] A final pretrial conference was held on September 1, 2022. *See* [R. 268].

the Pretrial Conference because Baptist split the cost of obtaining the transcript with Plaintiff. Plaintiff did not respond to Baptist's Objections.

Rule 54 provides that "costs shall be allowed as a matter of course to the prevailing party unless the court otherwise directs[.]" Fed. R. Civ. P. 54(d). Costs under Rule 54(d) "are confined to the costs itemized in 28 U.S.C. § 1920." *In re Cardizem CD Antitrust Litigation*, 481 F.3d 355, 359 (6th. Cir. 2007) (citing *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437 (1987)). Section 1920 dictates that a judge or clerk of any court of the United States may tax as costs the following:

> (1) Fees of the clerk and marshal;
> (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;
> (3) Fees and disbursements for printing and witnesses;
> (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
> (5) Docket fees under section 1923 of this title;
> (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

28 U.S.C. § 1920. The Sixth Circuit has clarified that "expert witness fees may not be taxed as costs at a court's discretion under Rule 54(d) because § 1920 does not provide for them." *L & W Supply Corp. v. Acuity*, 475 F.3d 737, 741 (6th. Cir. 2007). "Therefore, [a prevailing party] is not entitled to recover expert witness fees (i.e., the hourly rate charged for the expert's time and services)." *Id.*

Baptist is correct, therefore, that the deposition fees for Drs. Hyde and Breall cannot be taxed as costs. As Baptist notes, the deposition transcript fees may properly be taxed as costs, *see* 28 U.S.C. § 1920(2), but the fees paid to the experts themselves cannot be unless the experts are court appointed, *see id.* at § 1920(6). For this reason, the Court sustains Baptist's objections with

respect to those fees and will direct the Clerk of Court to set aside the $3,325 deposition fee for expert witness Dr. John Hyde and the $2,000 deposition fee for expert witness Dr. Jeffrey Breall.

Baptist also asks the Court to reduce by one-half the transcript fee claimed by Plaintiff from the October 25, 2021 Pretrial Conference since the parties split the cost of the transcript. Baptist submits that it mailed a check in the amount of $249.77 to Plaintiff's counsel's office on November 22, 2021, yet Plaintiff's Bill of Costs lists the full $499.55 fee. Plaintiff did not respond to Baptist's objections or otherwise refute Baptist's claim that the parties split this cost. Accordingly, the Court agrees it would be inequitable for Plaintiff to claim the full fee as a cost, having only incurred half that amount. The Court will sustain Baptist's objection with respect to this fee and will direct the Clerk of Court to reduce the October 25, 2021 pretrial conference transcript fee of $499.55 to $249.77.

### B. Baptist's Motion to Stay

Baptist has next moved to stay execution of judgment pending the Court's resolution of the instant post-trial motions and pending appeal. [R. 294]. Baptist seeks approval of its supersedeas bond in the amount of $2,658,450.00, to cover judgment and pre- and post-judgment interest. *Id.* at 1. Plaintiff did not submit a response opposing the stay.

Rule 62 provides that, "any time after judgment is entered, a party may obtain a stay by providing a bond or other security." Fed. R. Civ. P. 62(b). "The stay takes effect when the court approves the bond or other security and remains in effect for the time specified in the bond or other security." *Id.* "Rule 62(d) entitles a party who files a satisfactory supersedeas bond to a stay of money judgment as a matter of right." *Arban v. W. Pub. Corp.*, 345 F.3d 390, 409 (6th Cir. 2003). The Rule "is intended to protect the prevailing party's interest in the judgment while preserving

the status quo." *Lincoln Elec. Co. v. MPM Techs., Inc.*, No. 1:08-CV-2853, 2009 WL 3246936, at *1 (N.D. Ohio Oct. 6, 2009).

"'Courts generally require that the amount of the [supersedeas] bond include the full amount owed under the award, post-judgment interest, attorney's fees and costs.'" *Norton v. Canadian Am. Tank Lines*, No. CIV.A. 06-411-C, 2009 WL 3172105, at *1 (W.D. Ky. Sept. 29, 2009) (quoting *Johnson Verhoff v. Time Warner Cable, Inc.*, 2007 WL 4303743, at *3–4 (N.D. Ohio Dec. 10, 2007)). Baptist proposes a supersedeas bond in the amount $2,658,450, which represents 111% of the $2,395,000 judgment awarded to Plaintiff in this case. Baptist notes that "the Office of the Clerk of Court, Western District of Kentucky informs [that 111% of the Judgment] is the required amount for a supersedeas bond." [R. 294, p. 2 n.1]. Indeed, courts have found that 111% of a judgment is typically sufficient for a supersedeas bond. *See, e.g.*, *Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, No. 99-CIV-9294-CSH, 2003 WL 22048775, at *1 (S.D.N.Y. Sept. 2, 2003) ("Ordinarily the Clerk requires that security be given for 111% of the amount specified in the judgment or order from which the appeal will be taken."); *Agric. Servs. & Invs., Inc. v. Baggett Bros. Farm, Inc.*, No. 5:02-CV-080-SPM, 2005 WL 8158427, at *2 (N.D. Fla. Sept. 1, 2005) ("Other courts set amounts ranging from 111% of the judgment amount . . . to 120% of the judgment . . . to 125% of the judgment[.] . . . Considering that the judgment amount in this case ($448,038.58) already includes $10,583.18 in interest, the Court finds that a bond in the amount of 110% of the judgment is sufficient[.]").

Here, the Court finds that Baptist's proposed supersedeas bond in the amount of $2,658,450, which has not been opposed by Plaintiff, is sufficient to protect Plaintiff's interest as the prevailing party while maintaining the status quo pending appeal. Accordingly, the Court

hereby approves Baptist's supersedeas bond and grants its motion to stay execution pending appeal.

### C. Baptist's Rule 50 and Rule 59 Motion

Lastly, Baptist moves for judgment notwithstanding the verdict pursuant to Rule 50(b), for a new trial pursuant to Rule 59(a), or for remittitur under Rule 59(e). [R. 296]. The Court addresses each argument in turn.

### i.    Judgment Notwithstanding the Verdict

At the close of Plaintiff's proof and again at the close of all proof at trial, Baptist orally moved for judgment as a matter of law, which the Court denied. *See* [R. 301 (Trial Transcript), Vol. 4, pp. 107–109]; [R. 303 (Trial Transcript), Vol. 5, p. 153]. Pursuant to Rule 50(b), Baptist now renews its motion, arguing Plaintiff failed to present a legally sufficient evidentiary basis for the jury to find Baptist caused him any damages, and that Plaintiff failed to present clear and convincing evidence of gross negligence to allow the jury to award punitive damages. [R. 296, p. 2].

"If a court does not grant judgment as a matter of law after close of evidence and the party renews its request after a verdict is entered, the court may (1) allow the judgment to stand, (2) order a new trial, or (3) direct entry of judgment as a matter of law." *Miller as Next Friend of E.M. v. House of Boom Kentucky, LLC*, No. 3:16-CV-332-RGJ, 2022 WL 17836607, at *1 (W.D. Ky. Dec. 21, 2022) (citing Fed. R. Civ. P. 50(b)); *see also Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 400 (2006). Judgment as a matter of law, or judgment notwithstanding the verdict, may be granted when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Imwalle v. Reliance Med. Prod., Inc.*, 515 F.3d 531, 543 (6th Cir. 2008) (citations omitted).

In considering such a motion, the district court must view "the evidence in a light most favorable to the non-moving party, giving that party the benefit of all reasonable inferences." *Balsley v. LFP, Inc.*, 691 F.3d 747, 757 (6th Cir. 2012) (internal citations and quotation marks omitted). The Court may not "reweigh the evidence, question the credibility of witnesses, or substitute [its] own judgment for that of the jury." *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 306 (6th Cir. 2016). Where "there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party," the court should grant the motion. *Balsley*, 691 F.3d at 757.

Baptist submits that, "to avoid judgment as a matter of law, Plaintiff needed to present evidence at trial proving that, if the diversion had been correctly communicated and he had been taken straight to UK, it is more likely than not that he would have received pain-reducing treatment at UK prior to the time that his pain and heart attack resolved on their own" and that Plaintiff failed to do so. [R. 296, p. 3]. First, this argument misstates the factual issues the jury had to resolve at trial related to the pain and suffering Plaintiff experienced.[3] Before improperly construing them, Baptist even acknowledges that the issues were, rather, "whether the Plaintiff would have gotten quicker care at UK Medical Center if he had been sent there in the first place" and "whether the diversion caused [Plaintiff] to feel extra pain and suffering during the time lost mistakenly going to BHL." [R. 296, p. 3] (citing [R. 143] ("Memorandum Opinion and Order Granting in Part and Denying in Part Motion for Summary Judgment"), p. 12). Plaintiff did not, therefore, need to prove that he would have received pain-reducing treatment before 12:42 a.m., when his heart attack spontaneously resolved. He simply had to prove that he would have received quicker care but for the diversion (i.e., had he been taken straight to UK Medical Center or had he been treated at

---

[3] In addition, as discussed further below, even if Plaintiff had not shown he would have gotten faster care but for Baptist's diversion, his claim for emotional damages would have remained.

Baptist) and that the diversion caused him additional pain and suffering. And Plaintiff did produce such evidence.

Baptist's interventional cardiologist, Dr. Paula Hollingsworth, testified that if Baptist had not diverted Plaintiff, he could have been in Baptist's catheterization lab around 12:36 a.m., and after medical personnel readied Plaintiff for the catheterization procedure, they would have been ready to perform it at approximately 12:42 a.m. [R. 301 (Trial Transcript), Vol. 4, p. 28]. At UK Hospital, however, Plaintiff was not brought to the catheterization lab until 12:50 a.m. and was not catheterized until 1:02 a.m. *Id.* at 29. Still, Baptist suggests Dr. Hollingsworth's testimony actually demonstrates that Plaintiff would not necessarily have received faster care at Baptist. Baptist points to Dr. Hollingsworth's explanation that, "not only does it take a few minutes to get him up there, but then we have to get him on the table; we have to get his clothes off; we have to prep his groins; we have to sterilely drape him; we have to hook up the blood pressure machine. So there's still more of a delay there than just getting him up from the emergency room." [R. 312, p. 3] (citing [R. 306-1 (Transcript of Dr. Hollingsworth's Testimony), 29:10–21]). But this testimony would not prevent the jury from finding that Plaintiff would still have received faster care at Baptist. As stated, the evidence shows that Plaintiff arrived in UK Medical Center's catheterization lab at 12:50 a.m., but it took twelve minutes to prepare him for the catheterization procedure, which did not begin until 1:02 a.m. [R. 301 (Trial Transcript), Vol. 4, p. 29]. Thus, even assuming the necessary preparation Dr. Hollingsworth describes would have taken the same amount of time it took UK Medical Center (twelve minutes), the jury heard evidence that Baptist presumably still could have performed the procedure by approximately 12:54 a.m., which is sooner than it was

performed at UK Hospital. The evidence Plaintiff produced at trial clearly supports the jury's finding that he would have received faster care at Baptist had he not been diverted.[4]

Likewise, Plaintiff produced evidence on which the jury could properly find he experienced additional pain and suffering because of the diversion. Baptist urges, "even if [the hospital] had complied with EMTALA, Plaintiff's pain and suffering would have been the same" because Plaintiff's heart attack spontaneously self-aborted by 12:42 a.m. [R. 296, p. 5]. First, as discussed above, Plaintiff submitted evidence that the delay in care prolonged his pain. Plaintiff presented evidence indicating he was still in pain at least as late as 12:50 a.m., when he arrived at the UK Medical Center's catheterization lab, and perhaps as late as 1:02 a.m., when medical staff began his heart catheterization. *See* [R. 306-3, Ex. 3 (Trial Transcript), p. 39] ("Q. My question for you is, based on your review, did it show that he still had chest pain when he first got to UK? [Dr. David Glaser:] Yes. Q. And it resolved at UK after they administered him medication? A. That's what it appears."); *id.* at 43 ("Q. So this statement from the physician who actually performed the catheterization states that the chest pain had subsided and things had normalized after viewing the angiograms; right? [Dr. Glaser:] Right. And I saw somewhere else in the medical record that it was either in the cath room or during the cath that the chest pain resolved. So it wasn't necessarily in the emergency department, at least according to some other documentation that I saw."); [Joint Trial Exhibit 1 (Paris-Boubon County EMS Records), p. 11] ("The patient was moved over to the bed and report and care was transferred over to the Cath Lab staff. At the time that care was

---

[4] Moreover, the evidence demonstrates—and common sense dictates—that Plaintiff would have gotten faster care at UK Medical Center but for Nurse Blankenship's failure to notify EMS personnel during the first phone call that Baptist was on diversion and advise them to proceed directly to UK Medical Center. In fact, paramedic Ashley McBride testified that, while she could not be sure they did so on April 4, 2015, typically, "coming from Paris, UK is – we bypass UK to get to Central Baptist." [R. 299 (Trial Transcript), Vol. 2, p 141]. Thus, had Nurse Blankenship properly communicated the diversion during the first call, or had anyone at Baptist previously communicated the diversion plan to surrounding EMS as required, the ambulance transporting Plaintiff would have proceeded directly to UK Medical Center and would most likely have arrived there sooner than it arrived at Baptist.

transferred, pt. rated his pain at a 6/10 even after the administration of 1 Nitro, 4mg of Morphine and 3.81 mg AsA and 4 of Zofran."); [Joint Trial Exhibit 12 (Dr. Hassan Reda Consult Note), p. 4] ("His chest pain resolved when he received medicine in the emergency room[.]").

In addition to showing the pain from his heart attack was prolonged by Baptist's diversion, Plaintiff also provided evidence on which the jury could find he suffered additional pain that could be attributed to the stress of Baptist's diversion. As will be discussed further below, Plaintiff presented EMS records and testimony from medical personnel indicating his heart rate increased from 80 to 111 after Baptist refused to treat him. [Joint Trial Exhibit 1 (Paris-Boubon County EMS Records), p. 5]; [R. 306-3 (Trial Transcript, Testimony of Dr. David Glaser), p. 33]; [R. 299 (Trial Transcript, Testimony of paramedic Ashley McBride), Vol. 2, p. 139]. And Dr. Hollingsworth even acknowledged that an increase in blood pressure or heart rate can be a sign of emotional distress "or can be related to pain." *See* [R. 301 (Trial Transcript), Vol. 4, pp. 21–22].

Baptist points to contrary testimony and hospital records that indicate Plaintiff was pain free and symptomless by 12:42 a.m. and suggests, therefore, that it is entitled to judgment as a matter of law. [R. 312, p. 4]. As stated, however, only where "there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party," is judgment as a matter of law appropriate. *Balsley*, 691 F.3d at 757. Where, as here, the evidence could allow a reasonable jury to conclude for either party, the jury's verdict should not be disturbed.

Baptist next argues that because Plaintiff "has failed to provide legally sufficient proof of his claim for prolonged physical pain and suffering," the only remaining damages claim was "a stand-alone emotional distress claim that requires expert testimony." [R. 296, p. 7]. And, according

- 12 -

to Baptist, Plaintiff did not produce sufficient evidence to allow the jury to award such damages.

*Id.* This argument is wholly without merit.

The Court similarly rejected this argument the first time Baptist advanced it, at summary

judgment:

> In [*Indiana Ins. Co. v. Demetre*, 527 S.W.3d 12 (Ky. 2017)], the Kentucky Supreme Court addressed the extent to which its evidentiary standard for claims of negligent and intentional infliction of emotional distress, stated in *Osborne v. Keeney*, 399 S.W.3d 1 (Ky. 2012), is applicable to all cases in which a Plaintiff seeks emotional damages as part of his prayer for relief. In limiting *Osborne*, the Court held that the "requirement of expert medical or scientific proof is limited to claims of intentional or negligent infliction of emotional distress." *Demetre*, 527 S.W.3d at 39. The Court based its reasoning on the fact that "[w]hile the nature of 'stand-alone' emotional injuries creates a risk of fraudulent claims, that risk is reduced 'however, in a case in which a claim for emotional injury damages is one of multiple claims for damages.'" *Id.* (citing *Estate of Amos v. Vanderbilt Univ.*, 62 S.W.3d 133, 137 (Tenn. 2001)).
>
> Despite Defendant's argument to the contrary, this case does not involve stand-alone emotional injury damages. Rather, Plaintiff's complaint clearly alleges claims for negligence per se for violation of various Kentucky statutes, medical negligence, and violation of EMTALA. [R. 1-1, Compl., ¶¶ 14-28]. Further, Plaintiff alleges that these violations caused not only mental and emotional anguish, but also physical damage, prolonged pain and suffering, and medical expenses.
>
> This finding also applies to the Defendant's argument that the Plaintiff must show that the emotional injury is "severe or serious." The *Osborne* court stated that an emotional injury is sufficiently severe or serious only if it "significantly affects the plaintiff's everyday life or require[s] significant treatment." *Osborne*, 399 S.W.3d at 17. Defendant's reliance on *Osborne* is again misplaced, as the Kentucky Supreme Court has explicitly held that the heightened evidentiary standard from *Osborne* applies only to stand-alone claims for intentional or negligent infliction of emotional distress. *Demetre*, 527 S.W.3d at 39. Rather, the Court will apply the standard established by the Kentucky Supreme Court in *Motorists Mut. Ins. Co. v. Glass*, 996 S.W.2d 437, 454 (Ky. 1997), cited approvingly in *Demetre*, that requires a plaintiff's proof to "be clear and satisfactory. . . . [E]vidence based on conjecture will not support a recovery for such damages." The jury must be able to "infer that anxiety or mental anguish in fact occurred." *Id.* Therefore, the Court does not find that either expert testimony or any effect on the Plaintiff's everyday life is required as a matter of law for Plaintiff to show emotional damages in this case.

[R. 143 (Sept. 30, 2019 Order Denying in Part and Granting in Part Defendant's Motion for Summary Judgment), pp. 14–15].

Now, because Baptist stipulated to liability on Plaintiff's EMTALA and medical negligence claims, and only gross negligence and compensatory and punitive damages were contested at trial, Baptist again argues a heightened evidentiary standard applies to Plaintiff's claim for emotional damages because "[w]hen a medical negligence claim results only in emotional distress damages, it is the equivalent of a negligent infliction of emotional distress claim." [R. 296, p. 7]. Yet Baptist offers no supportive authority for this novel proposition. In *Demetre*, which remains instructive, the Kentucky Supreme Court recognized that "claims for emotional damages grounded in breach of contract or *violation of statute* . . . are less likely to be fraudulent than those advanced under a free-standing claim of intentional or negligent infliction of emotional distress" and therefore do not require heightened proof. 527 S.W.3d at 39. Plaintiff's emotional damages were not, and have never been, rooted in stand-alone claims for intentional or negligent infliction of emotional distress, the only theories for which the heightened evidentiary standard from *Osborne* applies. *See id.*; *see also Nekkanti*, 2022 WL 1504832, at *2 ("The state Supreme Court expressly distinguished the emotional-distress *cause of action* at issue in Osborne from the emotional-distress *damages* at issue in *Demetre*.") (emphasis in original). Moreover, Baptist's stipulation to liability on Plaintiff's negligence and EMTALA claims virtually eliminates any risk that Plaintiff's emotional damages claims were fraudulent or lacked merit.

Even so, Baptist contends that "if *Osborne*'s heightened standard does not apply in this case, Plaintiff still failed to present 'clear and satisfactory' proof to support his recovery of emotional damages." [R. 296, p. 8] (citing *Demetre*, 527 S.W.3d at 3). The Court disagrees. As Baptist acknowledges, Plaintiff testified that he feared he would die after being diverted to UK

Medical Center before first being stabilized at Baptist. *See* [R. 296, p. 18]; [R. 300 (Trial Transcript), Vol. 1, pp. 153–55] ("[Plaintiff:] I said a few choice words on the way out. I said, I guess you SOBs are going to let me die. Q. Did you feel that way? A. Yes, sir. I didn't know I was or I wasn't, but that's the way I felt that night."). Indeed, Plaintiff was so visibly upset that EMS personnel thought it necessary to recheck his vital signs, which is when they determined his heart rate had increased from 80 to 111. *See* [R. 299 (Trial Transcript), Vol. 2, p. 139] ("He wasn't happy about the situation, obviously. And that's why we quickly reassessed his vitals when we got him back into the ambulance."). Plaintiff also testified, while fighting back tears, that he called his daughter during his transport from Baptist to UK and testified that, in that moment, he was thinking of his family and hoping he would live to see them again. *Id.* at 154–55. As the Court acknowledged in its ruling on Baptist's motion for directed verdict, the force and effectiveness of Plaintiff's testimony cannot be gleaned from a cold transcript. [R. 303, pp. 121–23].

Dr. David Glaser testified that Plaintiff's heart rate went from 80 to 111 after being diverted, which he considered indicative of anxiety. *See* [R. 306-3 (Trial Transcript), p. 33]. Dr. Glaser further opined that it would be "very stressful" to be denied care while suffering a heart attack and noted paramedics transporting Plaintiff observed that Plaintiff was visibly upset after the diversion. [R. 306-3 (Trial Transcript), Vol. 5, p. 33]; *see also* [Joint Trial Exhibit 1 (Paris-Boubon County EMS Records), p. 11] ("Pt. was very unhappy, cussing and had an elevated pulse because [Baptist] would not accept him. We assured him UK was a great facility and they would not turn him away."). This evidence is sufficient to support an award of emotional damages. *See Banker v. Univ. of Louisville Athletic Ass'n, Inc.*, 466 S.W.3d 456, 463–64 (Ky. 2015) (affirming trial court's denial of directed-verdict motion because plaintiff's and her mother's testimony supported $300,000 emotional-distress award); *Nekkanti v. V-Soft Consulting Grp., Inc.*, No. 3:18-

CV-784-BJB-RSE, 2022 WL 1504832, at *3 (W.D. Ky. May 12, 2022) (finding plaintiff's own "detailed testimony about his mental state constitute[d] 'clear and satisfactory' proof on which the jury could've reasonably rested its [$75,000 emotional distress] verdict"). Baptist attempts to frame Plaintiff's anxiety at being turned away by Baptist as mere "ang[er] because he was not able to go to the hospital of his choice," since Plaintiff had specifically requested that EMS take him there. [R. 296, p. 8]. This argument, however convenient for Baptist, disregards the testimonial and documentary evidence from which a jury could find that Plaintiff was not merely angry—he feared for his life. Upon a thorough review of the record, and drawing all reasonable inferences in Plaintiff's favor, Baptist's arguments on the sufficiency of the evidence supporting the jury's compensatory damages award fail.

Baptist's final Rule 50(b) argument is that Plaintiff did not adduce sufficient evidence of gross negligence to allow the jury to award punitive damages. [R. 296, p. 9]. Baptist contends there was no evidence that Nurse Blankenship's actions amounted to gross negligence, that even if her actions were grossly negligence, Baptist never ratified, authorized, or anticipated them, and that Baptist's own actions in creating and communicating the diversion plan were not grossly negligent. *Id.* at 10–16. The Court is unconvinced.

First, with respect to Nurse Blankenship, the Court finds that the jury could find her actions sufficiently egregious to amount to gross negligence. "Gross negligence is a wanton or reckless disregard for the lives, safety or property of others." *Peoples Bank of N. Kentucky, Inc. v. Crowe Chizek & Co. LLC*, 277 S.W.3d 255, 267–68 (Ky. Ct. App. 2008) (internal citation and quotation marks omitted). "In a case where gross negligence is used as the basis for punitive damages, gross negligence has the same character of outrage justifying punitive damages as willful and malicious

misconduct in torts where the injury is intentionally inflicted" and "wanton or reckless disregard for the rights of others be implied from the nature of the misconduct." *Id.* at 268.

Importantly, "[w]here the potential for harm is great and directly evident, Kentucky has found that a reckless disregard for the rights of others may be inferred from the negligent act." *Id.* In *Saint Joseph Healthcare, Inc. v. Thomas*, the Kentucky Supreme Court found punitive damages could be awarded where evidence showed a hospital similarly "failed in the second aspect of its duty under EMTALA: to stabilize its patient before dismissing him from the emergency room." 487 S.W.3d 864, 873 (Ky. 2016). In *Saint Joseph*, the patient died after being discharged from the defendant hospital and told by hospital staff not to return despite being gravely ill. *Id.* The court reasoned, "the jury could have reasonably believed, as it apparently did, that the Hospital engaged in illegal 'patient dumping' in its actions toward Gray" and, "[g]iven the strong public policy against the conduct that EMTALA forbids," the court "conclude[d] that the evidence adequately supported findings of oppression and gross negligence so as to authorize a verdict for punitive damages." *Id.* So too here. Nurse Blankenship's actions in clear violation of EMTALA, which prohibits the kind of "patient dumping" that occurred in *Saint Joseph* and here, could lead a reasonable jury to find she was grossly negligent.

Further, the evidence at trial indicated Baptist's diversion plan was only communicated orally to hospital staff, without so much as a post-it note displayed in the Emergency Room Department, that it was miscommunicated (or not communicated at all) within Baptist's Emergency Department, and that it was not communicated to EMS personnel in violation of Baptist's own internal policies related to diversions and EMTALA. *See* [R. 306-4 (Trial Transcript), Vol. 5, p. 126]. Baptist even conceded that the diversion decision was not communicated uniformly or consistently, *see* [Joint Exhibit 6 (OIG Report), p. 4], and Dr. Stephen

Toadvine, who took part in the decision for Baptist to go on diversion, testified that he "communicated directly" with only one person, "the house supervisor," about the decision but did not "know of other communications that happened" and did not ensure it was appropriately disseminated. [R. 301 (Trial Transcript), Vol. 4, p. 153]. Further, Nurse Blankenship testified that she believed the hospital was only on diversion for Friday night, not Saturday night, and that she did not recall Nurse Newsome announcing the diversion in the pre-shift huddle on Saturday. [R. 299 (Trial Transcript), Vol. 1, pp. 7–8].

The evidence also showed that, prior to the night of April 4, 2015, Nurse Blankenship had only received "about five minutes" of EMTALA training. *Id.* at 127. This evidence could allow the jury to find Baptist should have reasonably anticipated Nurse Blankenship's actions. *See Morris v. Boerste*, 641 S.W.3d 688, 697 (Ky. Ct. App. 2022) ("University Hospital should have reasonably anticipated a sponge might be left in a patient when the worksheets provided to surgical teams did not include a place to record all sponge counts required by its policy."); *but see Univ. Med. Ctr., Inc. v. Beglin*, 375 S.W.3d 783, 794 (Ky. 2011), as modified on denial of reh'g (Mar. 22, 2012) (finding hospital could not have anticipated hospital employees' failure to order blood mid-surgery because "employees were well trained" and "[b]ut for a gross deviation from well established duties and policies, this event would not have occurred").

Baptist argues it could not have anticipated Nurse Blankenship's actions on the night of April 4, 2015 and points to the Court's September 30, 2019 summary judgment order noting, "generally courts have declined to find that an employer anticipated the conduct in question absent some pattern of conduct similar to the alleged gross negligence" and determining "[t]here is no indication in the record that Nurse Blankenship had any history of neglecting diversion orders or otherwise mishandling such aspects of patient care." [R. 143, p. 22] (citation omitted). Baptist,

however, conveniently ignores the fact that the Court later reversed its punitive damages ruling. *See* [R. 205 (Transcript of October 25, 2021 Pretrial Conference), p. 36]. The Court's reversal of its prior ruling included its findings with respect to "Nurse Blankenship's actions and the actions of the charge nurse." *Id.*

As the Court made clear during the original October 25, 2021 Pretrial Conference, here, as in *Horton v. Union Light*, 690 S.W.2d 382, 388 (Ky. 1985), "this is not a case [] to begin considering whether to limit the application of punitive damages against a principal. Here the acts of managerial employees in establishing policy and procedures and in failing to do so in training their personnel . . . implicated the company as a whole in the gross negligence." *Id.* at 35 (quoting R. 205). Indeed, Baptist's "liability for punitive damages is not based on a single, isolated, unauthorized, and unexpected act of negligence by an employee. The situation is not subject to the charge that the respondent is being punished when completely innocent and liable only vicariously." *Id.* Whether Baptist necessarily authorized, anticipated, or ratified Nurse Blankenship's actions on evening of April 4, 2015 is, therefore, not dispositive.

"[E]ven where a single act of negligence might not constitute gross negligence, gross negligence may result from [] several acts." *Horton*, 690 S.W.2d at 388 (internal citation omitted). "The conduct need not relate to a single event viewed in isolation." *Saint Joseph*, 487 S.W.3d at 871; *see also Phelps v. Louisville Water Co.*, 103 S.W.3d 46, 52 (Ky. 2003) (noting that a jury could find gross negligence when there were eighteen instances of misconduct, including several misrepresentations, violations of the company's internal policies and standards, failures to notify the proper entities, and improper conduct at work zone). Under this theory of liability, there was sufficient evidence upon which the jury could find Baptist's own actions, and the actions of several of Baptist's employees, taken together, were grossly negligent.

In denying Baptist's first motion for directed verdict, the Court listed the evidence upon which the jury could find gross negligence and, consequently, award punitive damages:

> So as far as that evidence, I'll just repeat the evidence that — the trial testimony of Mr. Williams, the other trial testimony that I have recited on the issue of physical pain, and then other evidence potentially that a reasonable jury viewing the evidence in the light most favorable to the Plaintiff could find there was gross negligence and for me to send the punitive damages issue to the jury.

> The failure of Baptist to activate the STEMI protocol, failure to alert local EMS of the diversion every three hours, and failure to call UK when Mr. Williams was actually sent to the University of Kentucky, and also failure to contact EMS per their policy after Mr. Williams showed up and was sent to UK so that it wouldn't happen again later that weekend, failure to disclose in the OIG report that this was a diversion for inbound STEMIs — now, you might view that in a different way, but the language of the OIG report just says "transfers to another hospital" — the fact that Nurse Blankenship didn't — the failure of Nurse Blankenship to write down who the EMS was that called and to take their telephone number; the testimony that Nurse Blankenship told EMS that they should go to Good Samaritan Hospital even though Good Samaritan did not have a cath lab.

> You know, the other side of that story is Nurse Blankenship said "I wasn't even aware that there was a Good Samaritan Hospital and I told them University of Kentucky," but we had multiple EMS folks take the stand and say "She told us Samaritan and in fact I put it in the report in parentheses 'Samaritan' because we all thought it was funny because we knew that Good Samaritan didn't even have a cath lab." So I thought that was pretty persuasive.

> Again, Nurse Blankenship — that's an issue of fact, you know, for the jury to decide, not the court. The jury said — Nurse Blankenship said "I didn't even realize really there was a Good Samaritan Hospital, so clearly I told them to go to UK." There's — there was not a single written communication that inbound STEMIs were being diverted, not even, you know, putting it on the — on the chalkboard for the night, not a post-it by the phones, etcetera. There just was literally — other than the huddle, there's just — there's just nothing written that reflects there was a diversion for inbound STEMIs. I didn't see a single thing.

> There's the Toadvine letter about transfers from other hospitals, but I didn't see anything written — and you've got an explanation for that, but, again, I have to view this evidence in the light most favorable to the Plaintiff at this stage of the proceedings. There were very clear violations of multiple internal policies and some folks who had, you know, a complete lack of understanding of the internal policies related to diversions and EMTALA. Baptist Hospital — you know, according to Mr. Midkiff — I can't remember if he was EMT or a paramedic. I think he was — . . .

He was the major. He was the head guy. He said that Baptist told him that it was a clerk, not a nurse, who took the EMS call and he was very clear about that.

Nurse Blankenship said she did not recall Charge Nurse Newsome telling her in the huddle Saturday night that they were on diversion. I would just say generally the — you know, the jury could hear the evidence that was presented and believe that there was a lack of a response by Baptist Healthcare after Nurse Blankenship got the call and alerted Charge Nurse Newsome because, you know, other than Mr. Bowman making some calls to EMS, there was no regrouping at that point by Baptist to say, "Oh, goodness. Somebody just showed up and we sent them away. Let's make sure if that happens again two hours from now that everybody knows, you know, what to do 'cause that's clearly an EMTALA violation." "We've got to stabilize" — you know, "We got to assess them, stabilize them, and treat them."

She didn't take down, as I mentioned, the phone numbers. No one told her what to do if he arrived. Nurse Newsome did not. No one called UK to say — no one from Baptist to say, "We just now diverted an inbound STEMI that actually arrived, but he's going to be there in five minutes."

No one called the local EMS folks for the rest of the weekend while they were on diversion. She said that the doctors heard her when she said, "I just told EMS to come on in, but now I realize that we're actually on diversion for inbound STEMIs."

There's some testimony that, you know, Baptist Hospital did or didn't interview certain key people related to these events. I believe Nurse Blankenship said she had about five minutes of EMTALA training.
. . .

And, I mean, even defense counsel admits that there was a violation of the standard of care, so I think that this is an issue of fact for the jury to decide; whether plaintiff — punitives are warranted.

[R. 303, pp. 124–28]; *see also* [Joint Exhibit 61 (OIG Report), p. 4] ("The communication of the decision was given verbally to the CHS, the ACC and the ED Charge Nurse, however the information was not passed further to the ED staff in a consistent or uniform manner."). Once again, the Court finds that the collective actions of Baptist employees and managers taken before, during, and after Plaintiff's improper diversion could allow the jury to find Baptist was grossly negligent.

Finally, Baptist submits that, despite its EMTALA violation, the hospital and its agents were at all times acting with patient safety at the forefront. "However, an alleged tortfeasor is not absolved of liability simply because it did some things right." *Saint Joseph*, 487 S.W.3d at 872. While Baptist may have made certain decisions on the April 3, 2015 weekend in the name of patient care, "focusing on the facts in the light most favorable to the punitive damages verdict, a more complete and disturbing picture emerges." *Id.* However well-intentioned, several Baptist employees made crucial errors in the days and weeks leading up to April 4, 2015, and on the night of April 4, 2015, for which Plaintiff suffered the consequences.

For all these reasons, Baptist is not entitled to judgment notwithstanding the verdict under Rule 50(b).

### ii.   New Trial or Remittitur

Under Rules 59(a) and 59(e), Baptist argues that, in addition to being against the weight of the evidence, the jury's award in this case is excessive and "appears to have been influenced by passion and prejudice." [R. 296, p. 16]. Baptist submits that even if Plaintiff had "adduced legally sufficient proof that Baptist's actions caused prolonged pain and suffering and emotional distress, the amount awarded by the jury to compensate these alleged injuries is grossly excessive." *Id.* at 17. Baptist therefore suggests either a new trial or remittitur is necessary. *Id.*

Under Federal Rule of Civil Procedure 59(a), a trial court may grant a new trial "on all or some of the issues" following a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1), (1)(A). The Sixth Circuit has interpreted Rule 59(a) to require a "seriously erroneous result," as evidenced by any of the following: "(1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings

being influenced by prejudice or bias." *Holmes v. City of Massillon, Ohio*, 78 F.3d 1041, 1045–46 (6th Cir. 1996) (citing *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940); *Cygnar v. City of Chi.*, 865 F.2d 827, 835 (7th Cir. 1989); *Mallis v. Bankers Tr. Co.*, 717 F.2d 683, 691 (2d Cir. 1983)); *see also Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, 53 F.4th 368, 379 (6th Cir. 2022).

Along the same lines, "[a] district court may grant a Rule 59(e) motion to alter or amend if there is: (1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice." *Intera Corp. v. Henderson*, 428 F.3d 605, 620 (6th Cir. 2005). "The purpose of Rule 59(e) is to allow the district court to correct its own errors, sparing the parties and appellate courts the burden of unnecessary appellate proceedings." *Howard v. United States*, 533 F.3d 472, 475 (6th Cir. 2008) (internal quotation marks omitted). However, "[a] motion under Rule 59(e) is not an opportunity to reargue a case." *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir. 1998).

When a motion for new trial challenges the weight of the evidence, the Court must "accept the jury's verdict 'if it is one which reasonably could have been reached.'" *Denhof v. City of Grand Rapids*, 494 F.3d 534, 543 (6th Cir. 2007) (quoting *Duncan v. Duncan*, 377 F.2d 49, 52 (6th Cir. 1967)). "[T]he grant or denial of a new trial is purely within the discretion of the trial court and will not be reversed except upon a showing abuse of discretion." *Logan v. Dayton Hudson Corp.*, 865 F.2d 789, 790 (6th Cir. 1989); *see also Caudill*, 53 F.4th at 379. The Court cannot set aside the jury's verdict simply because it thinks another result is more justified. *See Innovation Ventures, LLC v. N2G Distrib., Inc.*, 763 F.3d 524, 534 (6th Cir. 2014).

Having already determined the jury's verdict was supported by sufficient evidence, *see supra* Section II(C)(i), the Court considers whether either its compensatory or punitive damages award is excessive or was influenced by prejudice or bias.

### a. Compensatory Damages

Baptist positions that "[e]ven if Plaintiff adduced legally sufficient proof that Baptist's actions caused prolonged pain and suffering and emotional distress, the amount awarded by the jury to compensate these alleged injuries is grossly excessive" and that "Plaintiff's claimed injuries are even more minor than those presented in cases where the court still determined that damages were excessive." [R. 296, p. 17].

"A verdict is not excessive unless it exceeds the maximum that a jury could reasonably find to be compensatory for the plaintiff's loss." *Bach v. First Union Nat. Bank*, 149 F. App'x 354, 362 (6th Cir. 2005). "Unless the award is beyond the range that is supported by the proof, shocks the judicial conscience, or is a result of a mistake," the Court "must allow the jury verdict to stand." *Id.* (citing *Bickel v. Korean Air Lines Co.*, 96 F.3d 151, 156 (6th Cir. 1996)). "Courts consider both the individual facts of a case and awards in similar cases to determine excessiveness of a jury award." *Jackson v. A-C Prod. Liab. Tr.*, 622 F. Supp. 2d 641, 647 (N.D. Ohio 2009) (citing *Knight v. Metro. Gov't of Nashville & Davidson County*, 136 Fed. Appx. 755, 762 (6th Cir. 2005) (comparing awards in comparable cases from other circuits) (add'l citations omitted).

Again, the Court has already determined that sufficient evidence supports the jury's decision to award emotional damages and damages for prolonged and additional pain and suffering to Plaintiff. Now, the Court finds that, considering the facts of this case, the jury's compensatory damages award does not exceed the maximum the jury could reasonably have found for Plaintiff. *Bach*, 149 F. App'x at 362. Plaintiff suggests he "endured the most traumatic fear there is—the

fear of death" and that "[f]ew things cause greater anxiety than sudden fear of one's own impending death and how one's death might impact their family." [R. 306, p. 31]. The Court agrees—as the jury clearly did—that this fear, even if fleeting, is significant. *See supra* Section II(C)(i) (discussing evidence of Plaintiff's fear, pain, and suffering). The jury's decision to award Plaintiff $545,000 in compensatory damages does not, therefore, "shock[] the judicial conscience." *Bach*, 149 F. App'x at 362.

The Sixth Circuit has affirmed comparable emotional damages awards where plaintiffs did not suffer the imminent fear of death. *See, e.g.*, *Moorer v. Baptist Mem'l Health Care Sys.*, 398 F.3d 469, 486 (6th Cir. 2005) (finding $250,000 compensatory damages award for emotional distress on ADA discrimination claim was not grossly excessive); *Lilley v. BTM Corp.*, 958 F.2d 746, 754 (6th Cir. 1992) (holding that $350,000 mental anguish award for age discrimination was within the realm of other verdicts that have been upheld in similar cases); *Bach*, 149 F. App'x at 362 (affirming district court's finding that $400,000 compensatory damages award "does not shock the conscience" where "actual damages" were minimal but Plaintiff demonstrated "pain, suffering, and humiliation").

Courts outside the Sixth Circuit have upheld substantial "fear-of-death" emotional damages awards where the fear was shorter-lived than here. *See Haley v. Pan Am. World Airways, Inc.*, 746 F.2d 311, 317 (5th Cir. 1984) (finding $15,000 damages award "for no more than four to six seconds of" pre-impact fear prior to decedent's death in an airplane crash, "however brief it may have been," was not "shocking or contrary to the right of reason"); *Spielberg v. Am. Airlines, Inc.*, 105 F. Supp. 2d 280, 282 (S.D.N.Y. 2000) (upholding $150,000 emotional damages awards for twelve airline passengers' "fear of dying" caused by the traumatic experience of severe turbulence because the awards were "well within the range of similar New York verdicts for past

emotional distress brought on by traumatic events, [and] it cannot be said that the jury's verdict deviates materially from what would be reasonable compensation"); *Welch v. United Parcel Serv., Inc.*, 871 F. Supp. 2d 164, 197 (E.D.N.Y. 2012) (denying motion to remit $200,000 emotional damages award where plaintiff feared he would die due to dangerous working conditions).

Here, the Court similarly finds that the jury's $545,000 damages award for Plaintiffs' prolonged and increased pain and suffering, and for his fear of death, which lasted at least seven minutes, was not excessive. Even if the additional physical pain and suffering Plaintiff experienced was minimal, his emotional harm, standing alone, supports the jury's award. As the First Circuit observed, "converting feelings such as pain, suffering, and mental anguish into dollars is not an exact science" and "[t]he jury is free to harmonize the verdict at the highest or lowest points for which there is a sound evidentiary predicate, or anywhere in between . . . so long as the end result does not . . . strike such a dissonant chord that justice would be denied were the judgment permitted to stand." *Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1198 (1st Cir. 1995) (citation omitted). It would therefore be inappropriate to grant a new trial on or remit Plaintiff's compensatory damages award.

### b.  Punitive Damages

Lastly, Baptist submits that "even if punitive damages were properly presented to the jury for consideration, the $1,850,000 awarded exceeds constitutional limits." [R. 296, p. 19].

"The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). In *State Farm*, the Supreme Court outlined three factors for courts to consider in determining whether a punitive damages award exceeds constitutional propriety, which the Sixth Circuit succinctly summarized as follows:

> First, the court must assess the reprehensibility of the defendant's misconduct[.] . . . Second, a reviewing court should consider the disparity between the actual or potential harm suffered by the plaintiff—the injury covered by any compensatory damages award—and the punitive damages award. . . . Finally, the court may look to the difference between the relevant punitive damages award and the civil penalties authorized or imposed in similar cases.

*Bach v. First Union Nat. Bank*, 486 F.3d 150, 153 (6th Cir. 2007) (citing *State Farm*, 538 U.S. at 416) (cleaned up).

With these factors in mind, the Court finds that the jury's punitive damages award is not excessive. Considering the reprehensibility of Baptist's conduct, the Court considers whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Burton v. Zwicker & Assocs., PSC*, 978 F. Supp. 2d 759, 774 (E.D. Ky. 2013), aff'd, 577 F. App'x 555 (6th Cir. 2014) (citation omitted). First, at least some of the harm Plaintiff suffered was physical as related to pain and suffering. *See supra* Section II(C)(i). Second, because the Court has already found that Baptist's actions were sufficiently egregious to allow the jury to find it was grossly negligent, the Court finds its conduct "evinced an indifference to or a reckless disregard of the health or safety of others." *Burton*, 978 F. Supp. 2d at 774; *see also supra* Section II(C)(i), pp. 15–20; [R. 303, pp. 124–28]. On the third factor, there is no evidence Plaintiff was financially vulnerable at the time he presented at Baptist on April 4, 2015.

Consideration of the fourth factor is less straightforward but weighs in favor of Plaintiff. While there is no evidence any other "patient dumping" occurred during the April 3, 2015 weekend, there is evidence that the diversion plan continued to be miscommunicated (or not communicated at all) before and throughout the weekend, that the hospital continually failed to notify EMS personnel of the diversion plan even after the miscommunication that led to Plaintiff

- 27 -

being rejected at Baptist's doors, and, as the Court noted when denying Baptist's first motion for judgment as a matter of law, "there was no regrouping" after the incident involving Plaintiff to "make sure if that happens again two hours from now that everybody knows . . . what to do" to avoid another EMTALA violation. [R. 306-4 (Trial Transcript), Vol. 5, p. 127]. Conversely, Baptist presented some evidence demonstrating remedial measures taken within a week Plaintiff's diversion, which included creating "a PowerPoint presentation for the Emergency Department staff on EMTALA, and coordinat[ing] with a third-party organization to provide EMTALA training to all staff" and pleads that this was indeed an isolated incident. [R. 296, p. 12]. On the fifth factor, however egregious Baptist's and its employees' actions on April 4, 2015, it cannot be said that Plaintiff's harm was the result of intentional malice, trickery, or deceit.[5]

"Sixth Circuit precedent generally favors a reduction in punitive damages where only one of the reprehensibility factors is present," *Burton*, 978 F. Supp. 2d at 775, but here, at least two (and more likely three) are present. Next, and perhaps most importantly, "the disparity between the actual *or potential* harm suffered by" Plaintiff and the punitive damages award is not excessive. *Bach*, 486 F.3d at 153 (emphasis added). Frankly, the potential harm resulting from an EMTALA violation of this kind is death. Indeed, many claims brought under EMTALA are pursued by the victim-patient's estate. *See, e.g.*, *St. Joseph*, 487 S.W.3d 864; *Martin v. Ohio Cnty. Hosp. Corp.*, 295 S.W.3d 104 (Ky. 2009); *Taylor v. Jewish Hosp. & St. Mary's Healthcare, Inc.*, 26 F. Supp. 3d 642 (W.D. Ky. 2014); *Lawless v. Methodist Hosp.*, No. CIVA 4:05CV178-M, 2006 WL 1669873 (W.D. Ky. June 7, 2006). Had Plaintiff's heart attack not miraculously self-aborted later

---

[5] On this point, the Court will note, however, that Plaintiff has maintained throughout this litigation that Baptist misrepresented its EMTALA violations to the OIG. *See* [R. 255-1, p. 5]. Indeed, Baptist's official response in the right-hand column of the OIG Report does indicate the hospital was on diversion for "patients in transfer from another hospital," but Baptist's position at trial was that the hospital was on diversion for all incoming STEMI patients. *See* [R. 170 (Joint Statement of the Case), p. 1]. Toward the end of trial, Baptist filed a motion in limine [R. 285] to exclude any argument from Plaintiff that Baptist misled the OIG which, for the foregoing reasons, the Court denied. [R. 304, pp. 4–16].

that night, around 12:42 a.m., the delayed treatment caused by the diversion could certainly have resulted in Plaintiff's death. This risk, the Court is certain, was not lost on the jury.

Moreover, the actual harm Plaintiff suffered was not insignificant. As previously discussed, Plaintiff presented evidence that he suffered prolonged and additional intense chest pain, anxiety, and fear of death for several minutes that the jury reasonably found would not have occurred but for Baptist diverting him. As Plaintiff notes, "[e]ven if the delay only lasted 7 minutes, the jury's award comes out to $75,000 for every minute Mr. Williams believed he was going to die because of the diversion." [R. 306, pp. 30–31]. As discussed above, other courts have found that the fear of death, even if that fear lasts merely *seconds*, could justify significant damages awards. *See Haley*, 746 F.2d at 317; *Spielberg*, 105 F. Supp. 2d at 282; *Welch*, 871 F. Supp. 2d at 197.

On the final *State Farm* factor, the civil penalties authorized or imposed for comparable misconduct convince the Court that the punitive damages awarded here are not excessive. "In making this comparison, a reviewing court 'should accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue.'" *Clark v. Chrysler Corp.*, 436 F.3d 594, 607 (6th Cir. 2006) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 583 (1996)). Baptist notes that "[f]ines for EMTALA violations for hospitals with greater than 100 beds may be up to $103,139 for each violation." [R. 296, p. 20] (citing CMS Center for Clinical Standard and Quality/Survey & Certification Group, Appendix A, Calculation of CMP Adjustments). Although Baptist received no sanctions from the OIG because of its remedial measures, CMS found six violations of EMTALA and Baptist could have been fined up to $618,834. *Id.* Baptist suggests the jury's punitive damages award of nearly three times that amount was excessive. *Id.*

In affirming the lower court in *Saint Joseph*, the Kentucky Court of Appeals specifically rejected the premise that a punitive damages award cannot exceed the maximum civil penalties available for the same conduct:

> The civil penalties for violation of the Act are based upon breach of the statutorily imposed duties without regard to intent of the conduct. EMTALA does not require proof of improper motive for violation of the stabilization requirement. . . . Where there is proof that the violations were reckless *or grossly negligent*, a greater award of punitive damages may be appropriate. While the punitive damages award is significantly greater than the potential civil fine which could be imposed against the Hospital, we cannot say that it was clearly excessive in light of all of the circumstances presented in this case.

*Saint Joseph Healthcare, Inc. v. Thomas*, 2013 Ky. App. Unpub. LEXIS 1011, at *32-33 (Ky. App. 2013), aff'd, 487 S.W.3d 864 (Ky. 2016) (emphasis added). In other words, while the Court will consider the criminal or civil penalties imposed for comparable misconduct when considering excessiveness, the jury's award is not bound by those penalties. Here, Plaintiff submitted proof that Baptist's violations were grossly negligent, justifying a greater award of punitive damages.

Baptist further argues the jury's punitive damages award is unconstitutionally excessive due to the "nearly 3.5 to 1" ratio to compensatory damages. [R. 296, p. 21]. This argument is unavailing. As Baptist acknowledges, "the Supreme Court has not identified a concrete ratio" but "has emphasized that an award of four times the amount of compensatory damages might be close to the line of constitutional impropriety." *Clark*, 436 F.3d. at 606. The Supreme Court later determined that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process," and "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 501 (2008). Here, the jury's award does not exceed a single-digit ratio, nor does it reach the four to one ratio the Supreme Court found "might be close" to the constitutional limit. Likewise, the jury's

compensatory damages award is not so substantial that only a one-to-one ratio to punitive damages would be appropriate. *See Ragland*, 352 S.W.3d at 924 (distinguishing "more than $3.3 million" compensatory damages award as "substantial" compared to "compensatory awards . . . of a half-million dollars (with a 10-to-1 [punitive to compensatory damages] ratio) . . . of a quarter-million dollars (with a 20-to-1 ratio)") (citations omitted).

Lastly, Baptist argues, "[g]iven that the evidence presented at trial cannot justify the jury's award for either compensatory or punitive damages, it is evident that the jury was inflamed by the improper actions of Plaintiff's counsel" and provides a "non-exhaustive list" of such improprieties, which include:

> • In opening, showing the jury a slide of EMTALA settlement statistics. Counsel provided no justification for this undeniably inappropriate conduct, and instead immediately agreed to take down the slide—thereby indicating that he knew his action was improper.

> • In closing, violating this Court's order (R. 204) by explicitly urging the jury to "send a message" by returning a verdict with "at least two commas."

> • In closing, baselessly alleging that Baptist lied to the OIG to avoid termination of the hospital's participation in the Medicare program despite the fact that no testimony regarding Medicare or the process for termination was ever presented during the trial, and no evidence whatsoever suggested that Baptist lied to the OIG.

> • In closing, misrepresenting the evidence by stating that there was no evidence of any subsequent remedial measures until December, despite testimony from Susan Mobley, Micki Blankenship, and Nic Newsome that training was implemented within a week of the incident and the existence of a sign-in sheet documenting that 53 individuals received training in April 2015.

> • In closing, stating that punitive damage awards go to the state in some jurisdictions, despite the fact that this is not the case in Kentucky.

> • Implying without evidence that Baptist violated HIPAA by failing to have its experts sign a Business Associate Agreement, which was wholly irrelevant to Plaintiff's claims.

> • In closing, arguing that Baptist did not self-report its EMTALA violation, despite the fact that there is no duty to self-report. The only testimony regarding an

obligation to report was Dr. Glaser stating that UK violated its duty to report Baptist.

• In closing, misrepresenting the evidence by arguing that there was no investigation by Baptist into the incident, when the undisputed evidence clearly showed that Baptist immediately undertook an extensive investigation beginning in April 2015.

[R. 296, p. 21]. Baptist simply regurgitates its prior objections, unaccompanied by additional argument or law (or even citation to the record), and reasons that the jury would not have found for Plaintiff but for its reliance on improper passion and prejudice. "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (citation omitted). "It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *Id.* Because Baptist has failed to adequately develop this argument, it is waived.

Even considering the merits, this argument still fails, first, because the evidence presented at trial could justify the jury's compensatory and punitive damages award for all the reasons previously stated. Second, after each of Baptist's successful objections, the Court instructed the jury to disregard Plaintiff's counsel's improper arguments or required Plaintiff's counsel to correct its statements. *See generally* [R. 304 (Trial Transcript, Closing Arguments), Vol. 6, pp. 22–109]. "Admonitions can be easy cures to erroneous arguments or admissions of evidence." *Bailey v. Morris*, No. 2021-CA-1504-MR, 2023 WL 128718, at *3 (Ky. Ct. App. Jan. 6, 2023) (citing *Graves v. Commonwealth*, 17 S.W.3d 858, 865 (Ky. 2000); *Jacobsen v. Commonwealth*, 376 S.W.3d 600, 610 (Ky. 2012)). "Admonitions are usually sufficient, and there is a presumption that the jury will heed such an admonition." *Id.* (citing *Matthews v. Commonwealth*, 163 S.W.3d 11, 17 (Ky. 2005)). "An admonition to the jury to disregard an improper argument cures the error

unless it appears the argument was so prejudicial, under the circumstances of the case, that an admonition could not cure it." *Jefferson v. Eggemeyer*, 516 S.W.3d 325, 338 (Ky. 2017) (citing *Price v. Commonwealth*, 59 S.W.3d 878, 881 (Ky. 2001)). Baptist does not suggest the Court's admonishments were inadequate. Nor does Baptist explain why it believes Plaintiff's counsel's arguments were so prejudicial that the Court's admonition could not cure their effects. Baptist has failed to overcome the presumption that the jury heeded the Court's admonitions, and there is no reason to believe the jury's verdict was the result of passion or prejudice.

For all these reasons, the Court finds that the jury's verdict was not against the weight of the evidence, the compensatory and punitive damages awards are not excessive, and the proceedings were not influenced by prejudice or bias. *Holmes*, 78 F.3d at 1045–46. Baptist is not entitled to a new trial under Rule 59(a). It logically follows that remittitur under Rule 59(e) is not appropriate here. Indeed, "[o]nly when an award is 'grossly disproportionate' to the evidence presented may an award be remitted; extreme generosity is insufficient." *Blues To You, Inc. v. Auto-Owners Ins. Co.*, No. 1:21-CV-00165, 2022 WL 9753916, at *20 (N.D. Ohio Oct. 17, 2022). Baptist's arguments concerning remittitur are hardly developed, and among the four factors the Sixth Circuit has articulated to guide courts' consideration of Rule 59(e) motions, only the "need to prevent manifest injustice" is arguably applicable here. *Intera Corp.*, 428 F.3d at 620. Baptist points to no "clear error of law," "newly discovered evidence," or "intervening change in controlling law." *Id.* For the same reasons the Court finds the jury's verdict and damages awards are well-supported, are not excessive, and were not the result of bias or prejudice, the Court finds that no injustice would result from allowing them to stand. Baptist is not entitled to remittitur under Rule 59(e).

- 33 -

### III. CONCLUSION

1.  Defendant Baptist's Motion for judgment notwithstanding the verdict pursuant to Rule 50(b), for a new trial pursuant to Rule 59(a), or for remittitur under Rule 59(e) is **DENIED**.

2.  Defendant Baptist's Motion to Stay Execution of Judgment [**R. 294**] is **GRANTED**. Baptist's supersedeas bond in the amount of $2,658,450.00 is approved, and execution of the Judgment is **STAYED** pending appeal.

3.  Defendant Baptist's Objection [**R. 293**] to Plaintiff's Bill of Costs is **SUSTAINED**. The Clerk of Court is **DIRECTED** to reduce Plaintiff's Bill of Costs [**R. 291**] to the extent outlined above.

4.  Defendant Baptist's Motion for Leave to File Excess Pages [**R. 311**] is **GRANTED**.

5.  This is a **FINAL** and **APPEALABLE** order and there is no just cause for delay.

This the 8th day of May, 2023.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY

cc:     Counsel of record